---

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

LEON CARTER, Petitioner-Appellant,

v.

LIZZIE TEGELS, Warden, Respondent-Appellee.

---

**Appeal From The Eastern District of Wisconsin**
**District Court Case No. 17-CV-1497**
**The Honorable Pamela Pepper, Presiding**

---

**BRIEF AND REQUIRED SHORT APPENDIX OF**
**PETITIONER-APPELLANT**

---

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY S.C.
George Burnett
Attorneys for Petitioner-Appellant, Leon Carter

POST OFFICE ADDRESS:
231 South Adams Street
P.O. Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
State Bar No. 1005964
E-mail: gb@lcojlaw.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1266

Short Caption: Leon Carter, Petitioner-Appellant, v. Lizzie Tegels, Warden, Respondent-Appellee

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Leon Godfrey Carter, Jr.

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Firm of Conway, Olejniczak & Jerry, S.C.

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: Electronically Signed by George Burnett     Date: 9/4/24

Attorney's Printed Name: George Burnett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: 231 S. Adams Street,

Green Bay, WI 54301

Phone Number: 920-437-0476     Fax Number: 920-437-2868

E-Mail Address: GB@lcojlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................................. 2

TABLE OF AUTHORITIES ............................................................................. 5

   I.   Jurisdictional Statement ..................................................................... 8

   II.   Statement of the Issues ...................................................................... 8

   III.  Statement of the Case ........................................................................ 9

   IV.  Summary of the Argument ............................................................... 13

   V.   Standard of Review .......................................................................... 14

ARGUMENT ................................................................................................. 17

   I.   The absence of Carter and his counsel when the deputy re-instructed the jury so infected the trial that reversal must occur and the writ must issue. . 17

      A.  Carter was denied a fair trial when the courtroom deputy interfered with jury deliberations without the judge's permission or the parties' input. ........................................................................................... 17

      B.  The courtroom deputy's *ex parte* communication was presumptively prejudicial and, thus, Carter was denied a fair trial. ................................. 18

      C.  The deputy's communication influenced and coerced a verdict ................ 24

         1. The most important information is beyond Carter's reach. ................ 24

         2. The deputy's directive that the jury reach a verdict without an *Allen*-type instruction coerced the jury to reach a verdict ................... 25

         3. A *Brecht*-based analysis cannot apply to these constitutional errors. . 29

   II.   The state appellate court failed to recognize clear constitutional issues and consequently deprived Carter of his right to appellate counsel and due process. ....................................................................................... 30

      A.  The constitutional issues were clear ........................................................ 30

      B.  The Court of Appeals failed to explain its basis for summarily rejecting Carter's position ........................................................................... 31

         1. The court's opinion avoids all analysis of these constitutional issues. 31

         2. The no-merit report supplies only conclusions. .................................. 31

         3. The trial court's explanation was deficient, short, and wrong, but the Court of Appeals missed that, too. ................................................. 33

         4. The no-merit report violates *Anders v. California*. ............................... 34

      C.  Prejudice is presumed with the wrongful denial of appellate counsel. ..... 35

    D.  The *Brecht* standard does not apply to the wrongful deprivation of appellate counsel under *Penson v. Ohio*. ..................................................... 36

  III.  Carter's § 2254 habeas petition sufficiently apprised the district court that, even if the state appellate process were constitutionally adequate, he meant to independently claim that under *Remmer* the deputy's *ex parte* communication made his trial unfair. .............................................. 37

CONCLUSION .......................................................................................... 39

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ................ 40

CIRCUIT RULE 25(A) CERTIFICATION .................................................. 41

PROOF OF SERVICE ............................................................................... 42

CIRCUIT RULE 30(d) STATEMENT ........................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. United States*, 164 U.S. 492 (1896)................................................................. 21, 22

*Anders v. California*, 386 U.S. 738 (1967) ............................................... 13, 34, 35, 36

*Anderson v. Hardman*, 241 F.3d 544 (7th Cir. 2001) ................................................ 39

*Arizona v. Fulminante*, 499 U.S. 302 (1991)................................................................... 22

*Bell v. Cone*, 535 U.S. 685 (2002) ................................................................................ 18

*Bolton v. Akpore*, 730 F.3d 685 (7th Cir. 2013)........................................................... 38

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)................................................ 16, 29, 36

*Brooks v. Tennessee*, 406 U.S. 605 (1972) ................................................................ 18

*Brown v. Davenport*, 596 U.S. 118 (2022)............................................................ 15, 16

*Caver v. Straub*, 349 F.3d 340 (6th Cir. 2003)....................................................... 17, 18

*Chapman v. California*, 386 U.S. 18 (1967).......................................................... 11, 14

*Delgado v. Lewis*, 223 F.3d 976 (9th Cir. 2000)......................................................... 31

*Ferguson v. Georgia*, 365 U.S. 570 (1961)................................................................ 19

*Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76 (1919).............................................. 19

*French v. Jones*, 332 F.3d 430 (6th Cir. 2003) ........................................................... 18

*Geders v. United States*, 425 U.S. 80 (1976) .............................................................. 18

*Hamilton v. Alabama*, 368 U.S. 52 (1961) ................................................................ 18

*Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012).............................................. 14, 15

*Herring v. New York*, 422 U.S. 853 (1975)................................................................ 18

*Illinois v. Allen*, 397 U.S. 337 (1970) ........................................................................ 17

*Jenkins v. United States*, 380 U.S. 445 (1965)........................................................... 28

*Kelley v. State*, 51 Wis.2d 641, 187 Wis.2d 810 (1971) ...................................... 26, 27

*Kotteakos v. United States*, 328 U.S. 750 (1946)....................................................... 30

*Madison v. State*, 61 Wis.2d 333, 212 N.W.2d 150 (1974)........................................ 26

*Miller v. Smith*, 765 F.3d 754 (7th Cir. 2014)............................................................ 12

*Moore v. Knight*, 368 F.3d 936 (7th Cir. 2004) ................................................... 20, 25

*Neder v. United States*, 527 U.S. 1 (1999)........................................................ 16, 23, 29

*O'Neal v. McAninch*, 513 U.S. 432 (1995) ................................................................... 16

*Owens v. Duckworth*, 727 F.2d 643 (7th Cir. 1984)....................................................... 37

*Penson v. Ohio*, 488 U.S. 75 (1988) ............................................................... 35, 36, 37

*Pole v. Randolph*, 570 F.3d 922 (7th Cir. 2009)........................................................ 38

*Remmer v. United States*, 347 U.S. 227 (1954)................... 9, 13, 14, 16, 20, 37, 38, 39

*Riley v. Deeds*, 56 F.3d 1117 (9th Cir. 1995)............................................................ 22

*Rogers v. United States*, 422 U.S. 35 (1975) ............................................................ 19

*Rushen v. Spain*, 464 U.S. 114 (1983)............................................................... 25, 37

*Shields v. United States*, 273 U.S. 583 (1927) ................................................ 13, 19, 28

*Siverson v. O'Leary*, 764 F.2d 1208 (7th Cir. 1985)..................................................... 17

*Smith v. Robbins*, 528 U.S. .......................................................................... 34, 35

*State v. Burton*, 112 Wis.2d 560, 334 N.W.2d 263 (1983) .................................... 15, 32

*State v. Gibas*, 199 Wis.2d 525 ( Wis. Ct. App. 1996).......................................... 37, 38

*United States v. Cronic*, 466 U.S. 648 (1984)..................................... 13, 17, 18, 23, 33

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) ......................................... 35, 36

*Walberg v. Israel*, 766 F.2d 1071 (7th Cir. 1985)........................................... 23, 24, 25

*Warren v. Richland Cnty. Cir. Ct.*, 223 F.3d 454 (7th Cir. 2000) ............................. 14

*Weaver v. Massachusetts*, 582 U.S. 286 (2017) ........................................................ 23

*Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999)............................................... 21, 22

*White v. Maryland*, 373 U.S. 59 (1963) ................................................................... 19

*Williams v. Kaiser*, 323 U.S. 471 (1945) ................................................................ 19

*Ziegler v. State*, 65 Wis.2d 703, 223 N.W.2d 442 (1974) ............................................ 26

## Rules

F.R.A.P. 4(a)............................................................................................................ 8

## Statutes

### U.S. Code, Title 28

§ 1291....................................................................................................................... 8

§ 2241 ............................................................................................... 8

§ 2253 ............................................................................................... 8

§ 2254 ........................................................................................ 8, 9, 37

§ 2254(d) ......................................................................................... 15

§ 2254(d)(1), (2) ............................................................................. 12

**Wisconsin Statutes**

Wis. Stat. § 906.06 .............................................................. 24, 28, 29

## <u>Other Authorities</u>

Wis. JI-Criminal 520 ......................................................................... 26

## I.  Jurisdictional Statement

The District Court had subject matter jurisdiction over Petitioner-Appellant Leon Carter's petition for a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2254. On January 9, 2023 the United States District Court for the Eastern District of Wisconsin dismissed Carter's habeas petition and declined to issue a certificate of appealability, entering judgment the same day. (Dkt. 38, 39; A.App.1-35). On February 10, 2023, two days after the required time period to file a Notice of Appeal under F.R.A.P. 4(a), Carter filed a Notice of Appeal to the United State Court of Appeals for the Seventh Circuit. On March 1, 2023, this Court ordered that the appeal proceed after consideration of a Jurisdictional Memorandum. (Court of Appeals Dkt. 8; A.App.65). On May 28, 2024, this Court granted Carter's request for a certificate of appealability. (Court of Appeals Dkt. 11; A.App.63).

This Court has jurisdiction to review the denial of Carter's petition for habeas relief under 28 U.S.C. §§ 1291 and 2253.

The appeal is from a final judgment which dismisses Carter's petition. (Dkt. 39; A.App.1).

## II.  Statement of the Issues

(1)  Whether Carter was denied a fair trial when jurors asked what would happen if they could not agree on a verdict, and the courtroom deputy told them— without the judge's permission or parties' input—to keep deliberating;

   (a)  Whether the deputy's *ex parte* communication was presumptively prejudicial;

(b)  If no presumption of prejudice applies, whether Carter has shown that the communication had a substantial and injurious influence on the trial's outcome.

(2)  Whether the state appellate court violated Carter's constitutional rights by concluding that his direct appeal presented no issue of arguable merit and summarily affirming;

(3)  Whether Carter's § 2254 petition sufficiently apprised the district court that, even if the state appellate process was constitutionally adequate, he meant to independently claim that, under *Remmer v. United States*, 347 U.S. 227 (1954), and similar cases, the deputy's *ex parte* communication made his trial unfair.

## III.  <u>Statement of the Case</u>

In 2013, Leon Carter was convicted in Milwaukee County Circuit Court on four counts of second-degree sexual assault, one count of kidnapping, and one count of strangulation and suffocation following a jury trial. (Dkt. 24-21:84-6; A.App.51-3). Carter was sentenced to a total of sixty-three (63) years of initial confinement and twenty-three (23) years of extended supervision. (Dkt. 24-24:38-46).

Following receipt of the verdict, Carter moved for a mistrial after learning of an exchange between the jury and a courtroom deputy that interfered with jury deliberations. (Dkt. 24-21;87-8; A.App.54-5). The exchange involved a handwritten note the jury submitted during deliberations which read, "what happens if we do not unanimously agree on one of the six counts." *Id.* The note was signed by the jury foreperson. *Id.* Rather than bringing the question to the judge, who should have assembled the parties to formulate a proper response and then instructed the jury,

the courtroom deputy responded with her own instructions, as the court paraphrased it: "you need to just work and reach a unanimous verdict." *Id.* The trial court summarily denied the motion for mistrial, reasoning that the parties probably would have "come up with saying the same thing and in fact that's the jury instruction." *Id.* The full exchange is especially informative, as it demonstrates how quickly the trial court dismissed the deputy usurping the court's role and the absence of Carter and his counsel—without any discussion of the important rights the defendant lost. Though Carter had a constitutional right to be present at any communication with the jury and to be represented by counsel at the jury's re-instruction, the trial court acknowledged neither. The trial court held no hearing and never questioned jurors or the courtroom deputy about the exact content of the deputy's instruction and the jurors' understanding of it. Inexplicably, the trial court first revealed the exchange only after first receiving the verdict and discharging the jury. (Dkt. 24-21:86-8; A.App.54-6).

After filing a notice of appeal, Carter's appellate attorney compounded the situation by filing a no-merit report asserting no appealable issues existed. (Dkt. 24-2:42-3; A.App.61-2). As a part of the no-merit report, Carter's attorney concluded, in two short paragraphs, that petitioner received a fair trial and "the court properly denied the petitioner's motion for a new trial despite Deputy Kashishias's communication with the jury." (Dkt. 38:9; A.App.10; Dkt. 24-2:42-3; A.App.61-2). Appellate counsel relied solely on the trial court's explanation (quoted above) to conclude the communication was harmless and never explained how it

could be harmless beyond all reasonable doubt as *Chapman v. California* required (*Id.*). The report ignored the many contrary cases cited and discussed later in this brief. *Id.* Carter filed a response to the no-merit report, arguing that his attorney "relied on 'unexplained assumptions and [conclusory] allegations' to explain why he found the various issues meritless." (Dkt. 38:10; A.App.11). The Wisconsin Court of Appeals directed Carter's attorney to file a supplemental report on two unrelated issues. (Dkt. 38:10; A.App.11). All total, the report contained about one page dedicated to an analysis of these important issues. (Dkt. 24-2:42-3; A.App.61-2).

On November 5, 2015, the Wisconsin Court of Appeals summarily affirmed Carter's conviction after an "independent review of the trial record, the no-merit and supplemental no-merit reports, and the petitioner's response." (Dkt. 38:10; A.App.11; Dkt. 24-6:2; A.App.37). Though the Court of Appeals discussed several issues,[1] none pertained to those raised in this Court's certificate of appealability. (Dkt. 11; A.App.63-4). It certainly never addressed the significant constitutional issues before this Court. Instead, the court stated in a footnote:

> This court will not attempt to address every issue that arose in this case. The thirty-nine page no-merit report and the twelve-page supplemental no-merit report provide an exhaustive summary of the numerous motions and rulings that occurred before and during trial. As noted, we agree with counsel's analysis and conclusion that none of the issues identified presents an issue of arguable merit.

---

[1] The following issues were addressed by the Court of Appeals in its decision summarily affirming Carter's conviction: "the trial court's decision to admit the State's other acts evidence, the trial court's decision not to declare a mistrial after a Department of Corrections agent referred to the petitioner as a sex offender, the performance of the petitioner's trial counsel and the alleged excessiveness of the sentence." (Dkt. 38:13; A.App.14).

(Dkt. 24-6:4; A.App.39). The Wisconsin Court of Appeals ultimately concluded that there was "no issue of arguable merit that could be pursued on appeal." (Dkt. 24-6:2; A.App.37). Carter filed a petition for review in the Wisconsin Supreme Court, which ultimately denied review on May 5, 2016. (Dkt. 38:16-17; A.App.17-18; Dkt. 24-9; A.App.44).

Carter filed a federal habeas petition with the United States District Court for the Eastern District of Wisconsin on October 30, 2017, arguing that "the Wisconsin Court of Appeals had violated his Sixth Amendment right to effective assistance of appellate counsel and his Fourteenth Amendment right to a meaningful appeal when it accepted Attorney Schertz's [appellate counsel] no-merit report." (Dkt. 38:17; A.App.18). Carter's Sixth Amendment claim was eventually withdrawn for failure to exhaust the claim in state appellate proceedings. (Dkt. 38:17-20; A.App.18-21). Utilizing the standard under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the district court denied Carter's habeas petition,[2] reasoning that (1) The *Anders* procedure is not mandatory under the Constitution; and (2) even if the *Anders* procedure were mandatory, it does not require a state appellate court to address or independently review every potential issue raised. (Dkt. 38:30-3; A.App.31-4). Carter appealed the district court's decision to this Court.

---

[2] As addressed in more detail in the Standard of Review section, the AEDP allows a federal court to grant habeas relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Miller v. Smith*, 765 F.3d 754, 759-60 (7th Cir. 2014)(quoting 28 U.S.C. § 2254(d)(1), (2)).

## IV. <u>Summary of the Argument</u>

(1) Carter had a constitutional right under the Sixth and Fourteenth Amendments to the United States Constitution to be personally present and enjoy the assistance of counsel at each critical stage of the proceeding. When the deputy instructed the jury about how to deliberate in light of its deadlock *ex parte*, and without authority from the court and outside the presence of Carter and his counsel, the state violated Carter's rights.

2) The absence of Carter and his counsel at this critical stage of the proceeding is presumptively prejudicial and constitutes a structural error that requires no showing of prejudice under *United States v. Cronic*, *Shields v. United States*, *United States v. Remmer*, and many other cases.

(3) Requiring Carter to prove that the deputy's misconduct had a "substantial and injurious effect on the trial's outcome" conflicts with the wealth of precedent that presumes prejudice when a structural error occurs. Regardless, the deputy's directive to the jury to return to deliberations and reach a verdict told the jury that reaching a verdict was mandatory and presents a classic example of coercing a verdict.

(4) The state appellate court deprived Carter of his right to appellate counsel and due process when it failed to recognize the clear constitutional issues this case involved and merely observed the case presented "no arguable merit" when *Anders* and its progeny found such a certification inadequate to meet constitutional standards.

(5) Carter adequately apprised the district court of his position, because the district court's opinion articulates a clear understanding of Carter's arguments and because his brief clearly stated them. The district court understood he independently claimed under *Remmer* that the deputy's *ex parte* communication rendered his trial unfair.

## V.   <u>Standard of Review</u>

This Court reviews a district court's denial of habeas relief de novo. *Warren v. Richland Cnty. Cir. Ct.*, 223 F.3d 454 (7th Cir. 2000). If no state court has squarely addressed the merits of a habeas claim, this Court reviews the claim "as law and justice require." *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012).

Certainly, no state court *squarely* addressed the merits of Carter's federal constitutional claims, for none mentioned the important constitutional claims raised here in the short explanations each provided. When a state appellate court does not hint at any federal constitutional ground for its decision, it has not squarely addressed the merits of the federal constitutional claim. *Harris v. Thompson*, 698 F.3d 609, 624 (7th Cir. 2012). Carter's claim that he was not afforded a fair trial due to the deputy's interference with jury deliberations was not squarely addressed by the state appellate court, and the trial court certainly never mentioned a constitutional deprivation, either. (Dkt. 24-21:87-8; A.App.54-5).

Rather, in the no-merit brief submitted to the state court of appeals, Carter's attorney argued that the deputy's response to the jury's question met the harmless error standard required under *Chapman v. California*, 386 U.S. 18 (1967), largely

through citing *State v. Burton*, 112 Wis.2d 560, 570, 334 N.W.2d 263 (1983), which applied *Chapman*. (Dkt. 24-2:42; A.App.61). The Wisconsin Court of Appeals did not directly address the issue in its opinion, and instead merely "agree[d] with counsel's analysis and conclusion that none of the issues identified present[ed] an issue of arguable merit." (Dkt. 24-6:4; A.App.39). Therefore, no state court has squarely addressed whether Carter's constitutional rights were violated when the Wisconsin Court of Appeals summarily affirmed Carter's conviction. Moreover, the Wisconsin Court of Appeals obviously did not address its own alleged constitutional deficiency, and the Wisconsin Supreme Court declined to review the state appellate court's decision. In short, no state court hinted at any federal constitutional ground for its decision on either issue presented to this Court, and thus the issues were never squarely addressed by a state court. In light of the above, this Court should review Carter's denial of habeas relief "as law and justice require."

If the state Court of Appeals' cursory decision sufficiently articulates that the court addressed a constitutional question so that this Court finds a state court squarely addressed the merits of Carter's habeas claim, the Antiterrorism and Effective Death Penalty Act standard would apply. Under the AEDPA standard, a habeas petition may be granted Court "if a state court's ruling on a federal constitutional question 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Harris v. Thompson*, 698 F.3d at 622 (quoting 28 U.S.C. § 2254(d)). *Brown v. Davenport*, 596

U.S. 118 at 127 (2022), adds the petitioner should show the error produced a substantial and injurious effect on the verdict—that is actual prejudice so that the court is left with "grave doubt" about the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). *Brown* explained that in addition to AEDPA standards, equity controlled the writ's issuance, and *Brecht v. Abrahamson*, 507 U.S. 619 (1993), imposed that additional requirement as a matter of "equitable discretion." *Brown*, 596 U.S. at 133. However, *Brecht* should not apply to cases invoking structural error, where errors are unquantifiable or likely affected the verdict or the jury's deliberations in reaching a verdict. Such a structural error undermines the jury process and produces consequences that are "unquantifiable" and "indeterminate" and, therefore, requires reversal without an analysis for prejudice. *Neder v. United States*, 527 U.S. 1, 11 (1999).

When this occurs, courts presume prejudice and the writ must issue. Here, the courtroom deputy's *ex parte* communication with the jury during their deliberations was presumptively prejudicial. "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Remmer v. United States*, 347 U.S. 227, 229 (1954), for "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Id.*

## ARGUMENT

**I. The absence of Carter and his counsel when the deputy re-instructed the jury so infected the trial that reversal must occur and the writ must issue.**

**A. Carter was denied a fair trial when the courtroom deputy interfered with jury deliberations without the judge's permission or the parties' input.**

This appeal begins with the fundamental question of whether the deputy's *ex parte*, off-the-record instruction of the jury with neither the accused, his counsel nor the court present violated any constitutional right belonging to the defendant. Beyond debate, that misconduct violated both the Sixth and Fourteenth Amendments to the United States Constitution. As *Illinois v. Allen*, 397 U.S. 337, 243-3 (1970), holds, Carter had a constitutional right to be present personally at each critical stage of the trial, a right lost only by consent or behavior so disruptive that trial cannot proceed in his presence. Needless to say, neither exception applies here. Carter did nothing to justify his removal from the courtroom, and his absence at this stage was constitutionally unacceptable.

The absence of Carter's counsel was no different. Lawyers in criminal cases are "necessities, not luxuries. Their presence is essential because they are the means through which the other rights of the person on trial are secured." *United States v. Cronic*, 466 U.S. 648, 653 (1984). Therefore, "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Id.* at 659. Jury deliberations and re-instructing the jury represent such a stage. *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003); *Siverson v. O'Leary*, 764 F.2d 1208, 1214 (7th Cir. 1985).

In *Caver*, the writ issued because the trial court responded to a jury note and reread a substantive instruction despite counsel's absence. *Caver* explained a critical stage in a criminal proceeding is any step that holds "significant consequences for the accused," quoting *Bell v. Cone*, 535 U.S. 685, 695-96 (2002). *Caver* concluded with the absence of counsel for the jury's re-instruction, the writ must be granted, for "[a]ny conclusion otherwise would be an unreasonable application of clearly established federal law as stated in *Cronic*." *Id.* at 349, 350. *See also French v. Jones*, 332 F.3d 430, 438-39 (6th Cir. 2003).

**B. The courtroom deputy's *ex parte* communication was presumptively prejudicial and, thus, Carter was denied a fair trial.**

With little doubt over these constitutional violations, the deprivation of these rights leads to the ultimate question here of whether prejudice existed, whether it must be presumed, which side must establish its presence or absence, or even whether it is a pertinent inquiry.

A wealth of cases hold that counsel's absence involves constitutional error so significant that no showing of prejudice is required. "The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984), citing *Geders v. United States*, 425 U.S. 80 (1976); *Herring v. New York*, 422 U.S. 853 (1975); *Brooks v. Tennessee*, 406 U.S. 605, 612-13 (1972); *Hamilton v. Alabama*, 368 U.S. 52, 55

(1961); *White v. Maryland*, 373 U.S. 59, 60 (1963); *Ferguson v. Georgia*, 365 U.S. 570 (1961); *Williams v. Kaiser*, 323 U.S. 471, 475-6 (1945).

In *Rogers v. United States*, 422 U.S. 35, 37 (1975), a unanimous court found that accepting a jury's note asking whether the court would accept a verdict of guilty with its recommendation of leniency violated the defendant's rights because neither the defendant nor counsel were present when the trial court responded. The court addressed the subject as a violation of Fed. R. Crim. P. 43 but indicated that the court's intervention could not be harmless, since the "trial judge's response may have induced unanimity." *Id.* at 40.

In *Shields v. United States*, 273 U.S. 583 (1927), a deadlocked jury asked the court what to do if it could not agree on verdicts pertaining to some but not all defendants. The trial court responded outside the presence of the defendant and counsel that "the jury will have to find also whether Shields, Widman, and Gastman [the subject defendants] are guilty or not guilty." *Id.* at 584. The Supreme Court reversed the conviction due to the absence of the defendant and counsel. *Id.* at 587. *Shields* relied extensively on *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76 (1919), though a civil case, where the court held,

> Where a jury has retired to consider of their verdict, and supplementary instructions are required, either because asked for by the jury or for other reasons, they ought to be given either in the presence of counsel or after notice and an opportunity to be present; and written instructions ought not to be sent to the jury without notice to counsel and an opportunity to object.

*Id.* at 588. The court found a violation the defendant's right to be present "from the time the jury is impaneled until it is discharged after rendering the verdict." *Id.* at 588-89.

In *Remmer v. United States*, a case the court noted on its certificate of appealability, 347 U.S. 227 (1954), an unknown outsider communicated with a juror during trial, remarking that it could be profitable to bring a verdict favorable to the accused. At the behest of the court, the FBI investigated and shared its report only with the judge and prosecutors, who never informed the defendant of the incident. The Supreme Court vacated the conviction noting,

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such conduct with the juror was harmless to the defendant.

*Id.* at 229. The deputy's contact with the jury during trial instructing as to how to deliberate certainly qualifies as such a communication.

This Court reached a similar result in *Moore v. Knight*, 368 F.3d 936, 942-43 (7th Cir. 2004), where it held that even after an evidentiary hearing occurred about a bailiff's instruction to a jury (at the behest of the trial judge, who was not present), the evidence was too sparse to conclude the bailiff's communication had no effect on the jury's verdict convicting the defendant. The court explained that, under *Remmer*, private communications with jurors during trial about the trial are "presumptively prejudicial." The burden rests with the government to establish the contact harmless, and while contacts between jurors and judges might be evaluated differently, the bailiff's contact here fell under *Remmer*'s holding.

As for other courts, in a case remarkably similar to this one, *Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999), the jury sent the court a note asking whether they must reach a verdict on all counts. The bailiff received the note, telephoned the judge about its content, and, as the judge returned to the courthouse, the bailiff instructed the jury. Some jurors said the bailiff told them that they *must* reach a decision that evening, while others denied that occurred. Neither counsel nor the defendant knew about the note, or of the bailiff's interaction with the jury, until the court received a letter from a juror a week after the verdict criticizing the deliberations.

After hearing, the district court ultimately found that the state trial judge had told the bailiff to instruct the jury that it must reach a verdict on all counts. The *Weaver* court concluded that the district court's evaluation of what the judge did and the bailiff state was not a factual determination entitled to deference. The trial court's communication to counsel about what the bailiff said, just as the court's description of the communication here, was hearsay and subject to none of the usual judicial procedures designed to ensure accuracy: No one was under oath, and counsel never questioned the judge or the bailiff about the communication.

*Weaver* ultimately found that the message to the jury that it must reach guilty verdicts on all counts coerced the verdict. The omission of an *Allen* charge (based on *Allen v. United States*, 164 U.S. 492 (1896)) was especially important, since an *Allen* charge typically instructs a deadlocked jury how to strive for a unanimous verdict. *Allen* stressed deliberating: "with a proper regard and deference to the opinions of

each other" and that jurors should decide the case if they could do so conscientiously; they should listen with an open mind to each other and that if a larger number were for conviction, or if a larger number for acquittal, dissenting jurors should consider whether their doubt was reasonable. *Allen*, 164 U.S. at 501.

None of that occurred in *Weaver*, and none of it occurred here. Without the benefit of an "offsetting cautionary instruction informing jurors that they need not give up their conscientiously held views," the bailiff's instruction was coercive. *Weaver*, 197 F.3d at 366. The court concluded that this and other evidence showed sufficiently that the bailiff's charge essentially had a substantial and injurious effect to coerce a verdict. *Id.* at 366.

In *Riley v. Deeds*, 56 F.3d 1117, 1120 (9th Cir. 1995), a clerk read back trial testimony at a jury's request, despite the judge's absence. The Court of Appeals concluded that that was such a fundamental error, the writ of habeas corpus must issue. Despite the fact that counsel and the parties were present when the law clerk took action, the court emphasized that court officials communicating with a jury without the court's approval "cannot fairly be characterized as mere trial error." *Id.*

> Trial error is error "which may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." Structural error, on the other hand, is a "defect[ ] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless error' standards." A conviction obtained after a proceeding in which no judge presided and no judicial discretion was exercised is "abhorrent to democratic conceptions of justice."

*Id.* at 1120, *quoting in part Arizona v. Fulminante*, 499 U.S. 302, 308-09 (1991). In such circumstances, courts presume prejudice.

More recently, *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017), explained why structural errors require reversal. The court advised some errors are structural when defendants are deprived of choices they have a right to make, others are structural if the effects of the error are simply too hard to measure; yet other errors are structural if the error almost always results in fundamental unfairness. *Id.* at 295-96. *Weaver* concluded, "[I]n the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome." *Id.* at 299, quoting *Neder v. United States*, 527 U.S. 1, 7 (1999).

While the structural error in *Weaver*—closing a courtroom for jury selection— differed from the structural errors here, the remedy should be, as *Cronic* shows, the same. Many structural errors cannot be quantified though the deprivation is severe and too important to overlook. As discussed later, the state is solely responsible for loss of Carter's rights here. The burden of showing injury lifts when the government created the deprivation. *Walberg v. Israel*, 766 F.2d 1071, 1076 (7th Cir. 1985), involved a trial judge who impermissibly interfered with the presentation of the defense and jeopardized the efficacy of defense counsel's performance. Like that jurist in *Walberg*, the deputy here stood in for the State, and through the deputy's misconduct the State caused the violation of the defendant's Sixth and Fourteenth Amendment rights. It is inherently unfair to require Carter to prove the misconduct was consequential. As this Court put it in *Walberg*, the state cannot say, "[S]ure we

violated your rights, now prove it made a difference." *Id.* The important point is that this is not a case where Carter's or his counsel's absence was attributable to the poor performance, misjudgment, or misconduct—no one was absent voluntarily; they simply did not know the jury had raised a question or that the deputy intended to answer it.

### C. The deputy's communication influenced and coerced a verdict.

#### 1. The most important information is beyond Carter's reach.

A serious question exists initially over whether Carter must show the deputy's communication had a "substantial and injurious" influence on the trial's outcome, when the events at circuit court made it exceedingly difficult, if not near impossible, for him to do so. For one, he was missing from court, so neither he nor his counsel can address firsthand what the deputy told the jury. Second, the trial court held no hearing, so there exists no thorough account of the instruction, much less one given under oath and subject to thorough cross-examination. Instead, the trial court dedicated a minute or two to the issue, noting only that the jurors passed a note and that the deputy addressed it *ex parte* and informed the jurors to return to deliberations and reach a verdict. The court summarily denied the defendant's mistrial motion, noting that the court would have instructed similarly. Yet the court provided no detail as to exactly what the court would have instructed and how it might have differed from (or coincided with) the bailiff's message. Add Wisconsin's prohibition about questioning jurors about deliberations, Wis. Stat. § 906.06, and the government has made it near impossible for Carter to establish whether this

circumstance affected the verdict—when all of this occurred throughout no fault of Carter's.

After all, as *Walberg* established, there is something fundamentally unfair, even wrong, when the state causes the problem by preventing the assistance of counsel and the presence of the defendant at a critical stage. Given the casual treatment the state courts gave the question, any forecast about the product of the deputy's *ex parte* communication approaches speculation, since no one knows why the jury was deadlocked, what counts the disagreement centered on, and how strongly jurors felt about their respective positions on both the deadlocked count and on others. No jury verdict is final until the court receives it, so jurors could easily, and perhaps did, change their minds out of a desire to end deliberations after the deputy's instruction. Yet, jurors may not testify about the deliberations or their own mental processes in arriving at a verdict, *Rushen v. Spain*, 464 U.S. 114, 121 n.5 (1983), so that most important information is largely beyond Carter's reach.

## 2. The deputy's directive that the jury reach a verdict without an *Allen*-type instruction coerced the jury to reach a verdict.

Much depends on what the deputy said, and that is simply too uncertain for this Court to be confident that the comments were as innocuous as the lower courts treated them. A deadlocked jury seeks guidance from the only source it can look to—the court—and is especially vulnerable to influence from the court or those apparently in authority. *Moore*, 368 F.3d 936, 939 n.1 (7th Cir. 2004). So any communication should be developed and provided with care not to influence or coerce the verdict. No excuse or justification has ever been offered for the deputy's

intervention and assumption of the trial court's role. Wisconsin has a carefully crafted jury instruction to be used where a deadlocked jury seeks guidance. *See* Wis. JI-Criminal 520; *Kelley v. State*, 51 Wis.2d 641, 643, 187 Wis.2d 810, 812 (1971) (quoting instruction verbatim); *Madison v. State*, 61 Wis.2d 333, 339-40, 212 N.W.2d 150, 154 (1974) (same). The instruction does not goad the jury into reaching a verdict, as the deputy's command to reach a verdict did here. Instead, it emphasizes collaboration, respectful discussion, and listening, but in the end adhering to a juror's own beliefs. It tells a jury that collegiality—compromise for the sake of compromise—is wrong if it sacrifices the juror's true beliefs.

That pattern jury instruction is designed as a modified *Allen* charge, to be given when deliberations stall or deadlock. The charge, developed and in place since at least 1971, has been reviewed and approved by the Wisconsin Supreme Court in *Kelley v. State*, 51 Wis.2d 641, 643-7, 187 N.W.2d 810 (1971); *Madison v. State*, 61 Wis.2d 333, 339-40, 212 N.W.2d 150 (1973); and *Ziegler v. State*, 65 Wis.2d 703, 707-09, 223 N.W.2d 442 (1974). *Madison* and *Kelley* quote it verbatim.

There is a reason the pattern instruction stresses not what the deputy told the jury (as the court related it) but, rather, states the opposite.

> You are not going to be made to agree, nor are you going to be kept out until you do agree. It is your duty to make an honest and sincere attempt to arrive at a verdict. Jurors should not be obstinate; they should be open-minded; they should listen to the arguments of others, and talk matters over freely and fairly, and make an honest effort to come to a conclusion on all of the issues presented to them.

It bears no resemblance to the instruction the deputy provided *sua sponte* and, as *Kelley* explains, it is the product of a long and considered effort to address any

inherent coercion that might have existed in the charge *Allen* endorsed. It was developed with considerable study and effort and complements the instruction the American Bar Association offered on the subject, something else explained at length in *Kelley*. The important point is that, with this instruction available, no reason existed for the deputy to substitute her own and it is doubtful counsel would have agreed without objection.

Based, then, on the sparse information the Wisconsin courts revealed, the deputy's instruction almost certainly coerced the jury into reaching a verdict. What we know is that, despite receiving a question around noon, the court informed the defense that the jury had sent a note asking for guidance only after deliberations ended, after accepting the verdict, and after discharging the jury. It told counsel and the defendant that "Deputy Terrell responded in [the court's] absence that you need to just work and reach unanimous verdict, is that correct, Deputy?" A different deputy, Deputy Kashishias, responded, "It was actually me, Deputy Kashishias," without articulating what instruction the jury actually received or even confirming that the court's recitation was accurate and complete.

That is it—the only account of the deputy's communication that exists. Thus, no one knows exactly what the jury was told or how it was re-instructed. No one knows whether the conversation was long or short or whether it occurred with all or some jurors or just the jury foreperson. No one knows why the deputy took it upon herself to address the jury without the court's involvement, and no one knows whether the jury had follow-up questions that it orally communicated to the deputy and received

a response. No one knows for sure how the jury interpreted the deputy's remarks, and especially whether one or more jurors believed they must reach a verdict, as the deputy's command strongly suggested.

As the court described the instruction the deputy gave, it coerced a verdict. The terms "you need to just work and reach a unanimous verdict" can mean nothing else. In *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam), a trial judge who instructed a deadlocked jury, "You have got to reach a verdict in this case," coerced the jury's guilty verdict.

Moreover, compounding that coercion, the court excluded counsel altogether. For reasons never revealed, the court kept this communication to itself, never alerting anyone—not the defendant, or his counsel, or the prosecution—that it had occurred until after the court discharged the jury. As the trial court acknowledged, it must consult with counsel to formulate a response, and only then should the court instruct the jury. *Shields*, 273 U.S. at 588.

The problem is further complicated because, as mentioned, Wisconsin law forbids questioning jurors about deliberations. Not every juror would interpret the deputy's cursory instruction the same way. Some might hear simply return to deliberations, and others will certainly hear something different: a directive to return to deliberations and the command to reach a verdict. Wisconsin Statute § 906.06 limits jurors' testimony. No matters or statements about deliberations or about any juror's thinking or emotions can be elicited either by testimony or affidavit. Jurors may reveal only whether "extraneous prejudicial information" or

an outside influence "was brought to bear on any juror," but they may not reveal how that extraneous or outside information influenced deliberations. *Id.* So Wisconsin law actually forbids a comprehensive inquiry. Jurors cannot explain if or how the instruction affected the verdict. No meaningful analysis can occur when the state places the most critical information out of bounds.

### 3. A *Brecht*-based analysis cannot apply to these constitutional errors.

Even then, the state's focus on what the deputy said is wrong or at least incomplete. Under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), the proper inquiry is whether the *constitutional error* "had substantial and injurious effect . . . on the jury's verdict." But what is the error here? It is not only the coercive content of the deputy's instruction, but also Carter's compelled absence from this critical stage of his trial and the exclusion of his lawyer from the instruction itself and from all opportunity to evaluate and address the instruction beforehand. These are structural errors, the type that deprive a defendant of basic protections and are so indeterminate and unquantifiable that the precise effect is too difficult to measure. *Neder v. United States*, 527 U.S. 1, 9 (1999).

Searching for actual prejudice is a requirement that does not apply to this class of fundamental constitutional errors, errors that defy analysis by such standards. *Id.* Here, secret communications by court officials with the jury during deliberation—in violation of a defendant's right to be present and to the assistance of counsel at this critical stage certainly qualifies as a structural error.

In sum, as largely explained already, the deputy's direction to the jury plainly had a coercive effect regardless. At its origin, *Brecht*'s precursor, *Kotteakos v. United States*, 328 U.S. 750, 764-5 (1946), held:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764-65.

The circuit court sentenced Carter to six decades' imprisonment. No one should spend six decades in prison based on such a cursory record, much less under a requirement that he prove the adverse effects of constitutional errors the government alone imposed upon him.

II. **The state appellate court failed to recognize clear constitutional issues and consequently deprived Carter of his right to appellate counsel and due process.**

    A. **The constitutional issues were clear.**

The state appellate court's failure to appreciate these clear constitutional issues violated his constitutional right to due process, especially because it deprived Carter of appellate counsel when he required counsel for the presentation of his case. This Court certified several constitutional issues, when the state appellate court concluded there were none. And, the issue the court dismissed was obvious: depriving Carter of his lawyer at the critical stage of proceedings where the deputy

re-instructed the jury, and conducting that effort outside Carter's presence clearly violated several constitutional rights. One hundred years of Supreme Court precedent showed that the absence of counsel and of the defendant at any critical stage of proceedings violates the Constitution and mandates a finding of prejudice. (*See* pp. 15-22, *supra*).

## B. The Court of Appeals failed to explain its basis for summarily rejecting Carter's position.

### 1. The court's opinion avoids all analysis of these constitutional issues.

The appeals court adopted counsel's no-merit report as a substitute for an independent analysis. The absence of a cogent rationale from the appellate court for a contrary conclusion impedes habeas review. An unreasoned decision does not warrant the deference normally shown state court decisions, especially on important legal issues like these. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). Moreover, the no-merit report itself gave brief attention to the central issue—indeed the only issue identified in this Court's certificate of appealability. That the Wisconsin Court of Appeals accepted this without articulating its own analysis or even an explanation for its conclusion underscores the casual evaluation the court undertook. If a no-merit report is deficient, a judicial decision adopting that report without analysis is equally deficient.

### 2. The no-merit report supplies only conclusions.

Thus, it is far from certain what the Court of Appeals actually decided. Despite clear authority to the contrary, the state court focused on whether the constitutional

error could be harmless. And, to that point, the Wisconsin Court of Appeals

explained virtually nothing; in fact, it explicitly declined to explain anything:

> This court will not attempt to address every issue that arose in this case. The thirty-nine page no-merit report and the twelve-page supplemental report provide an exhaustive summary of the numerous motions and rulings that occurred before and during trial. As noted, we agree with counsel's analysis and conclusion that none of the issues identified presents an issue of arguable merit.

(Dkt. 24-6:4; A.App.39). While the district court cited the length of the no-merit

report, the point is illusory. For one, the 12-page supplemental report had nothing

to do with the deputy's intervention and communication with the jury. So, too, with

the 39-page preliminary report. That report dedicated two short paragraphs

describing the factual background. (Dkt. 24-2:31-2; A.App.59-60). As for analysis,

the report dedicated two short paragraphs to the subject, citing just one state court

case, *State v. Burton*, 112 Wis.2d 560 (1983), in support. (Dkt. 24-2:41-2;

A.App.61-2).

For analysis, the report first acknowledged that the deputy's communication

violated Carter's constitutional rights. "A defendant has a constitutional right to be

present with counsel when the jury is being instructed." (Dkt. 24-2:42). Then the

report noted, "Communication with the jury outside a defendant's presence,

however, is subject to a harmless error analysis" and added, "A defendant is not

entitled to a new trial where the error complained of is harmless beyond a

reasonable doubt." *Id*. Not true, as the considerable precedent, described above, (*see*

pp. 16-22, *supra*), establishes, for if the error is structural, prejudice is presumed.

*Ex parte* communication with the jury at a critical stage outside the presence of

counsel and the defendant is presumed prejudicial since at least *Cronic*. The

absence of the defendant and his counsel violates the Sixth and Fourteenth

Amendments and, as with other structural errors, requires that the writ issue.

### 3. The trial court's explanation was deficient, short, and wrong, but the Court of Appeals missed that, too.

The no-merit report nevertheless explained that the error must be harmless

because the court observed that the deputy's answer was the same answer that it

would have given (after consulting with counsel). (Dkt. 24-2:42-3). The trial court

stated that it would have (1) assembled counsel, (2) received input and commentary

from counsel, (3) reached a consensus and only then instructed the deadlocked jury,

most likely with the pattern instruction meant for that circumstance.

> I would note that's not my standard practice. I would not have responded to this without assembling you. The reality is we probably all would have come up with saying the same thing and in fact that's the jury instruction, but I did want to put that on the record. I don't think that it changes the integrity of the verdicts that were received.

*Id.* The court apparently thought the supplemental jury instruction stated the same

directive that the deputy communicated. But, as already established, it does not tell

the jury that you "need to just work and reach a unanimous verdict."

Rather than tell the jury to "work and reach a unanimous verdict," it instructs,

"You are not going to be made to agree, nor are you going to be kept out until you do

agree." That important assurance was missing from the deputy's account—or

rather, the court's account of the deputy's account. So, the idea that the jury would

have been instructed that it *must* continue to deliberate and reach a unanimous

verdict is exactly the opposite of what this supplemental instruction communicates. Appellate counsel serving Carter certainly would have identified this flaw.

### 4. The no-merit report violates *Anders v. California*.

And the appellate court's adoption of the no-merit report is flawed in other ways.[3] The no-merit report announces, "There would thus be no merit two [*sic*] a motion for a new trial based upon a claim that the court erroneously exercised its discretion in denying this final post-verdict motion [pertaining to the deputy's re-instruction]." (Dkt. 24-2:43; A.App.62). But a finding of "no merit" fails to pass muster under *Anders v. California*, 386 U.S. 738 (1967). As the Court explained in *Smith v. Robbins*, 528 U.S. 259, 270 (2000):

> In *Anders*, neither counsel, the state appellate court on direct appeal, nor the state habeas court made any findings of frivolity. We concluded that a finding that the appeal had "no merit" was not adequate because it did not mean that the appeal was so lacking in prospects as to be frivolous. The court therefore rejected the state's procedure, insisting on a finding of frivolity.

In short, a finding of no arguable merit does not substitute for a finding of frivolity. One means that there is a poor likelihood of success on appeal, while the other means there is no legitimate basis to argue for reversal within legal and ethical boundaries. The difference is that, in one, counsel merely acts as an amicus for the appellate court, advising on the strength of a possible appeal. In the other, counsel's ethical obligations preclude serving as counsel. That required finding of frivolity is

---

[3]  For one, the no-merit report is deficient, since *Anders* required the report to "refer to anything in the record that might arguably support the appeal." *Smith v. Robbins*, 528 U.S. at 270. This no-merit report mentions nothing on this important subject and actually overlooks the extensive legal authority that contradicts its view.

entirely absent here as well. Thus, accepting the no-merit report without finding frivolity unconstitutionally deprived Carter of counsel.

## C. Prejudice is presumed with the wrongful denial of appellate counsel.

And, as *Smith v. Robbins* also explains, prejudice is presumed with the actual or constructive denial of the assistance of appellate counsel altogether. *Id.* at 286. "In other words, while we normally apply a 'strong presumption of reliability' to judicial proceedings and require a defendant to overcome that presumption, when, as in *Penson*, there has been a complete denial of counsel, we understandably presume the opposite." *Id.*

*Penson v. Ohio*, 488 U.S. 75, 86 (1988), found that a state appellate court erred in permitting counsel to withdraw simply because, based on the court's own review, the conviction should be affirmed regardless of counsel. Applying that harmless error analysis stripped the accused of the very rights *Anders* conferred, the *Penson* court found. *Id.* Likewise, in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-49 (2006), the Court explained that the Sixth Amendment right to counsel was violated and no harmless error analysis required, when the petitioner was deprived of counsel of his choice. The court explained,

> We have little trouble concluding that erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.' Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the

erroneous denial of counsel bears directly on the "framework within which the trial proceeds," or indeed on whether it proceeds at all.

*Id.* at 150.

By extension here, the petitioner was similarly deprived of appellate counsel altogether. Appellate counsel have different, but no less complicated and varied choices. Since "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternative universe," Carter need show no harm at all. *Id.*

### D. The *Brecht* standard does not apply to the wrongful deprivation of appellate counsel under *Penson v. Ohio*.

Next, the *Brecht*-based question of whether there exists a substantial and injurious effect on the trial's outcome does not apply to this appeal. The state appellate court's deprivation of Carter's counsel by concluding his direct appeal had no "arguable merit" certainly deprived him of counsel in violation of *Anders* and, therefore, fell outside the *Brecht* standard. *Brecht* inquires only whether there was a substantial and injurious influence on the *trial's* outcome. 507 U.S. at 623. But this deprivation involved the appeal, so *Brecht* is inapplicable to this case by its own terms.

Even so, were the question whether this deprivation made a difference—a substantial and injurious influence on the appeal's outcome—that is the wrong question to ask about the denial of appellate counsel because *Penson* forbids it. It, as *Penson* holds, proves too much. "Mere speculation that counsel would not have made a difference is no substitute for actual appellate advocacy, particularly when

the court's speculation is itself unguided by the adversary process." 488 U.S. at 87.

As in *Penson*,

> [I]t is important to emphasize that the denial of counsel in this case left petitioner completely without representation during the appeal. It is more than defective performance by counsel, it is an actual or constructive denial. As we stated in *Strickland*, the [a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.

*Id.* at 88. [Quotations and citations omitted].

### III. Carter's § 2254 habeas petition sufficiently apprised the district court that, even if the state appellate process were constitutionally adequate, he meant to independently claim that under *Remmer* the deputy's *ex parte* communication made his trial unfair.

The district court understood that Carter independently claimed under *Remmer v. United States*, 347 U.S. 227 (1954), that the deputy's *ex parte* communication rendered the trial unfair. The district court's recitation of the issues that Carter raised confirms this. The district court explained,

> The petitioner argues that the Milwaukee County Circuit Court erred throughout his trial. He maintains that the court (1) violated *Rushen v. Spain*, 464 U.S. 114 (1983) when it failed to conduct a hearing to determine whether Deputy Kashishias's communication with the jury was harmless, *id.* at 11 [Dkt. 29:11]; (2) violated *Remmer v. United States*, 347 U.S. 227 (1954) when it failed to find that communication presumptively prejudicial, *id.* at 11; (3) violated *Owens v. Duckworth*, 727 F.2d 643 (7th Cir. 1984) when it declined to place the burden on the government to establish that contact between Deputy Kashishias and the jury was harmless, *id.* at 11-12; (4) violated Wisconsin law by failing to find Deputy Kashishias's communication with the jury to be prejudicial as a matter of law, *id.* at 13-14 (citing *State v. Gibas*, 199 Wis.2d 525 ( Wis. Ct. App. 1996)) . . . .

(Dkt. 38:22; A.App.23). That excerpt establishes that the district court understood that Carter challenged the proceedings below as well as the State's appellate process.

Just as the district court's description of Carter's position confirms its clarity, Carter's brief confirms his position. Here, Carter described the issue in six pages in his habeas brief to the district court by developing a thorough legal argument that his trial was unfair due to the deputy's *ex parte* communication with the jury. On multiple occasions, Carter explicitly argued that his trial was unfair (s*ee, e.g.*, Dkt. 29:10-16):

> Carter argues that the trial courts finding that "it didn't think there [was] any prejudice" is clearly erroneous. . . . Carter argues, here the government was relieved of its burden by the trial court. . . . Carter argues that the bailiffs instruction lacked a necessary element of a valid supplemental instruction on agreement . . . . Carter contends as a matter of law, his bailiff-like the bailiff in *Gibas*-communication was per se prejudicial. . . . Carter argues that the aforementioned factors in *Gibas* led to the court of appeals finding affirming the circuit courts holding that the error was not harmless. Carter contends that no different finding should follow in this case.

[Citations omitted]. Further, Carter specifically noted that his argument regarding the court of appeals' adoption of the no-merit report was "in addition" to his argument regarding the trial court's failure to provide him a fair trial. (Dkt. 29:12). Carter presented an in-depth analysis of the facts of his case as they apply under *Remmer* and similar cases.

When a *pro se* petitioner raises an issue—and Carter raised the issue *pro se*—in either a habeas petition or a brief in the district court, the district court has been sufficiently apprised of the issue to warrant federal appellate review. *Bolton v. Akpore*, 730 F.3d 685, 694 (7th Cir. 2013). Even if a claim is not listed or addressed separately from other arguments in front of the district court, if the petitioner develops a legal argument in support of his claim the issue is not forfeited on appeal. *See Pole v. Randolph*, 570 F.3d 922, 937-38 (7th Cir. 2009). Carter filed both

his habeas petition and his brief in the district court pro se, and thus his filings are therefore held to "less exacting standards than those prepared by counsel and are to be liberally construed." *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

For all these reasons, Carter sufficiently apprised the district court of his independent claim under *Remmer*, and thus did not forfeit his appeal.

## CONCLUSION

For these reasons, the Court should reverse the judgment of the district court and remand with direction to issue the writ.

Dated this 4th day of September, 2024.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Petitioner-Appellant, Leon Carter

By: *Electronically signed by George Burnett*
State Bar Number: 1005964

231 S. Adams Street/PO Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
GB@lcojlaw.com
*5145413*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because it contains 8,905 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f)

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 12-point Century Schoolbook font

Dated this 4th day of September, 2024.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Petitioner-Appellant, Leon Carter

By: *Electronically signed by George Burnett*
State Bar Number: 1005964

231 S. Adams Street/PO Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
GB@lcojlaw.com

# CIRCUIT RULE 25(A) CERTIFICATION

The undersigned hereby certifies that I have electronically filed, pursuant to

Circuit Rule 25(a), the brief and all of the appendix items.

Dated this 4th day of September, 2024.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Petitioner-Appellant, Leon Carter

By: *Electronically signed by George Burnett*
State Bar Number: 1005964

231 S. Adams Street/PO Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
GB@lcojlaw.com

## PROOF OF SERVICE

I, George Burnett, hereby certify that on September 4, 2024, I caused to have electronically filed the Brief and Required Short Appendix and Separate Appendix of the Petitioner-Appellant, Leon Carter, by using the CM/ECF and that service will be accomplished by the CM/ECF system.

Dated this 4th day of September, 2024.

> LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
> Attorneys for Petitioner-Appellant, Leon Carter

> By: *Electronically signed by George Burnett*
> State Bar Number: 1005964

231 S. Adams Street/PO Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
GB@lcojlaw.com

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Required Short Appendix and Separate Appendix of Petitioner-Appellant.

Dated this 4th day of September, 2024.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Petitioner-Appellant, Leon Carter

By: *Electronically signed by George Burnett*
State Bar Number: 1005964

231 S. Adams Street/PO Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
GB@lcojlaw.com

No. 23-1266

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

LEON CARTER, Petitioner-Appellant,

v.

LIZZIE TEGELS, Warden, Respondent-Appellee.

**Appeal From The Eastern District of Wisconsin
District Court Case No. 17-CV-1497
The Honorable Pamela Pepper, Presiding**

**REQUIRED SHORT APPENDIX
OF PETITIONER-APPELLANT**

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY S.C.
George Burnett
Attorneys for Petitioner-Appellant, Leon Carter

POST OFFICE ADDRESS:
231 South Adams Street
P.O. Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
State Bar No. 1005964
E-mail: gb@lcojlaw.com

# Required Short Appendix
## Table of Contents

| Docket Number | Description | Page Nos. |
|---|---|---|
| 39 | Judgment in a Civil Case, 1/9/23 | A.App. 001 |
| 38 | Order Dismissing *Habeas* Petition (DKT. No. 1), Dismissing Case and Declining to Issue a Certificate of Appealability, 1/9/23 | A.App. 002-035 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LEON CARTER,

        Petitioner,

   v.

LIZZIE TEGELS,

        Respondent.

**JUDGMENT IN A CIVIL CASE**

Case No. 17-cv-1497-pp

---

☐    **Jury Verdict.** This case came before the court for a trial by jury. The parties have tried the issues, and the jury has rendered its verdict.

☑    **Decision by Court.** This case came before the court, the court has decided the issues, and the court has rendered a decision.

      **THE COURT ORDERS AND ADJUDGES** that the petition for writ of *habeas corpus*, filed under 28 U.S.C. §2254, is **DISMISSED**.

      **THE COURT DECLINES** to issue a certificate of appealability.

      **THE COURT ORDERS** that this case is **DISMISSED**.

      Approved and dated in Milwaukee, Wisconsin this 9th day of January, 2023.

                    **BY THE COURT:**

                    **HON. PAMELA PEPPER**
                    **Chief United States District Judge**

                    GINA M. COLLETTI
                    Clerk of Court

                    s/ *Cary Biskupic*
                    (by) Deputy Clerk

LEON CARTER,

         Plaintiff,

    v.                                 Case No. 17-cv-1497-pp

LIZZIE TEGELS,[1]

         Defendant.

## ORDER DISMISSING *HABEAS* PETITION (DKT. NO. 1), DISMISSING CASE AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

On October 30, 2017, the petitioner, who is incarcerated at Jackson Correctional Institution and is representing himself, filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging his 2013 conviction in Milwaukee County Circuit Court on four counts of second-degree sexual assault, one count of kidnapping and one count of strangulation and suffocation. Dkt. No. 1; see also State v. Carter, Milwaukee County Case No. 11CF003689 (available at https://wcca.wicourts.gov).

On March 25, 2019, the court adopted Magistrate Judge William Duffin's report and recommendation and denied the respondent's motion to dismiss the petition. Dkt. No. 22. The petitioner filed a brief in support of the petition on

---

[1] Under Rule 2 of the Rules Governing Habeas Cases, "[i]f the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody." The petitioner is incarcerated at Jackson Correctional Institution; this order reflects Warden Lizzie Tegels as the respondent.

1

August 30, 2019. Dkt. No. 29. About five weeks later, the respondent filed an opposition brief. Dkt. No. 30. On December 13, 2019, the petitioner filed a reply. Dkt. No. 33.

The court will deny the petition and dismiss the case.

## I.     Background

A.     State Case

1.     *Pre-trial Proceedings*

An amended criminal complaint charged the petitioner with six felonies, ranging from second-degree sexual assault to kidnapping and strangulation. Dkt. No. 24-6 at 2. The charges involved the same victim—a woman referred to as Smith (a pseudonym)—with whom the petitioner had had a relationship for over ten years. Id. The complaint accused the petitioner of severe physical, sexual and psychological abuse, suggesting he treated Smith as 'property.'" Id. The petitioner previously had pled guilty to battering and intimidating Smith in 2002 and 2004. Id.

At a pre-trial motion hearing on March 9, 2012, the petitioner stated that he was prepared to argue a Shiffra[2] motion that he previously had filed with the court. Dkt. No. 24-2 at 5.[3] He also discussed a discovery motion in which he sought police reports to prove that the alleged victim had made prior false

---

[2] State v. Shiffra, 175 Wis. 2d 600 (1993), "a case where the Wisconsin Court of Appeals . . . establish[ed] procedures for an *in camera* review of a complainant's confidential records." Rizzo v. Smith, 528 F.3d 501, 506 (7th Cir. 2008).

[3] This portion of the procedural history is adapted from the first no-merit report filed by the petitioner's appellate counsel, Attorney Dennis Schertz.

2

accusations against a police officer. Id. The State opposed the Shiffra motion. Id.

During a July 20, 2012 pretrial motion hearing, the prosecutor asked whether the petitioner "would be renewing [his] Shiffra motion, which, [the prosecutor] stated, the court had previously denied." Id. at 6. Regarding the petitioner's subpoena for police records, the court questioned the relevance of the alleged events from 2003 to the alleged events "in the present case in 2010." Id. at 6. The petitioner responded that the records would show Smith's prior false allegations of sexual assault, and "might also contain information relating to the victim's mental health . . . which was the subject of [his] Shiffra motion." Id. When asked "why his request was not just a 'fishing expedition,'" defense counsel cited his client's affidavits and the attachments to it. Id. at 7. The court adjourned the trial date. Id.

At another hearing on August 6, 2012, the court "expressed its continuing concern that the subpoena was just a fishing expedition, but [] stated that it would review the documents *in camera* . . . at the next court appearance." Id. "At that next hearing on September 17, 2012," the court "noted some additional issues relating to the defense's Shiffra motion." Id. at 8-9.

At a motion hearing on November 8, 2012, the court again discussed the petitioner's request for Ms. Smith's mental health records, reiterating that it alleged "issues that Ms. [Smith] may have had in 2003 or 2002." Dkt. No. 24-11 at 17. The court denied the petitioner's motion to reconsider the ruling on

3

the petitioner's <u>Shiffra</u> motion, stating that it had "made [its] ruling" and

"[would not be] redoing that." <u>Id.</u> Again, the court questioned the relevance of

Ms. Smith's alleged mental health issues from seven or eight years prior to

incidents that had occurred in 2010. <u>Id.</u> After the petitioner's trial counsel,

Julius Andriusis, stated that he "[didn't] know if [Ms. Smith's] condition

worsened up or bettered up or what happened with her since that time," <u>id.</u>,

the court continued:

> THE COURT: But as I recall, when I dealt with the <u>Shiffra</u> motion,
> there was really no basis. It was in my view a fishing expedition
> based on nothing other than some bald—bold assertions from your
> client. There was no—it didn't meet the legal criteria of <u>Shiffra</u>. I am
> not revisiting that issue, so let's deal with these 2000 and 2003
> claims. The issue is remoteness in time. In 2002 I wasn't even a
> judge. Now I've been a judge for 9 years. That's a long time frame.
> Seven or eight years is a very long time frame. Having a mental
> health issue in 2003 does not . . . necessarily mean[] that you are
> faking something or lying . . . about allegations 8 years later.
>
> ATTORNEY ANDRIUSIS: Well, as I can say, maybe it's a fishing
> expedition as this Court called my original motion that I filed, but
> these reports I guess support my fishing expedition and it was one
> police report attached that were—
>
> THE COURT: Well, actually, no, they don't, counsel. That's my point.
> Because someone had an issue in 2002 does not mean they are
> having the same issue in 2010. Some mental health issues. . . [are]
> . . . situational. That doesn't mean the same thing is occurring 8
> years later.

<u>Id.</u> at 18-19. The prosecutor reasoned that under <u>Shiffra</u>, the petitioner's

motion did not cite sufficiently "specific information that would lead the [c]ourt

to believe that there are some mental health records . . . that contain

information that would likely be material to [the petitioner's] defense." <u>Id.</u> at 19.

The court continued:

4

THE COURT: . . . Beyond everything I've already said, there has to be specificity . . . If someone is being treated for depression and they are taking Prozac, . . . that in most cases has nothing to do with anything because it doesn't affect that person's ability to relay events to the police, it doesn't appreciate or affect that person's ability to . . . understand reality, to function day to day, to work, to have a job, to give a police officer a police report. If you had evidence of someone having . . . a psychotic disorder or being detached from reality or hearing voices, that might be a different situation. Here if there's anything, it's mild assertions and limited indications of mental health issues 7 or 8 years before the alleged multiple offenses by [the petitioner].

Id. at 19-20. The court concluded:

[A]t this point I'm not allowing anything to be discussed about Ms. [Smith] and her situation with the police officer in 2002 or 2003. It's remote in time. It's likely not to add anything to this trial. If there's a discussion during the case, during the victim or alleged victim's testimony of mental health issues if she's on her medication in 2010 when these crimes allegedly occurred, it might come out.

Id. at 21. The court clarified that its ruling was "not a blanket bar," and that if it became relevant, "there may be some discussion at the trial of the victim or alleged victim's mental health issues." Id. at 21-22. It reiterated, however, that whether "8 years prior to this incident, Ms. [Smith] was being treated for depression and sleep problems" was "not relevant to what she was doing in 2010 and whether or not [the petitioner] committed multiple felonies against her." Id. at 22.

On December 11, 2012—a week before the petitioner's trial—the circuit court held a final pretrial conference. Dkt. No. 24-12. The State informed the court that it was ready for trial after its investigator made travel arrangements in order to comport with the petitioner's speedy trial demand. Id. at 2-4. The court then turned to the petitioner, who stated that while he "wish[ed] to be

5

ready to proceed," he was concerned about whether certain witnesses would appear. Id. at 4. The court advised the petitioner that because of his speedy trial demands and because "[t]he State just went through extraordinary steps," the case was going to trial next week. Id. After the petitioner repeated his concern about witnesses, the court stated that it would not adjourn the trial, stressing again the petitioner's speedy trial demands, the age of the case and the interest of fairness. Id. at 5. Attorney Andriusis then asked the court to make a record:

> ATTORNEY ANDRIUSIS: . . . just a few more things I would like to place on the record. I met with client yesterday, we discussed the case . . . I would like to make record of the case, Judge. So client expressed some dissatisfaction with me, maybe I have to let you go. So this was read to me and—
>
> THE COURT: We can address that right now. Your client doesn't make that call, I do. You are not being released from your duties in this case. This case is a year and a half old, you're the second attorney on this case, it is proceeding to trial on Monday.

Id. at 4-6.

### 2. *Trial in Milwaukee County Circuit Court*

The petitioner's theory of defense was that he did not hold Smith against her will and that she was lying. Dkt. No. 24-6 at 2. To support that defense, the petitioner unsuccessfully attempted to introduce Smith's "past mental health treatment and a prior allegation against a police detective that resulted in an internal affairs report." Id. The jury found the petitioner guilty on all counts, and the court sentenced him to a total of sixty-three years of initial confinement and twenty-three years of extended supervision, including: four consecutive terms of fifteen years of initial confinement and five years of

6

extended supervision; one consecutive term of three years of initial

confinement and three years of extended supervision; and one concurrent term

of fifteen years of initial confinement and five years of extended supervision. Id.

at 3.

After the court addressed the post-verdict motions, dkt. no. 24-21 at 86-

87, it made a record of an exchange between the jury and a courtroom deputy:

> THE COURT: I do also want to note for the record that we did receive
> the following handwritten question over the lunch hour. It says:
> What happens if we do not unanimously agree on one of the six
> counts, and it is signed by the foreperson. I think Deputy Terrell
> responded in my absence that you need to just work and reach
> unanimous verdict, is that correct, Deputy?

> COURT OFFICER: It was actually me, Deputy Kashishias.

> THE COURT: I would note that's not my standard practice. I would
> not have responded to this without assembling you. The reality is
> we probably all would have come up with saying the same thing and
> in fact that's the jury instruction, but I did want to put that on the
> record. I don't think that it changes the integrity of the verdicts that
> were received.

Id. at 87-88. The petitioner moved for a mistrial, arguing that Deputy

Kashishias's response to the jury's question interfered with the jury's

deliberations. Id. at 88. The court denied the motion, reasoning that because

(1) the language of the jury instructions stated that "the jury has to reach

together to reach unanimous verdict," and (2) the court and the parties likely

would have provided the same response, Deputy Kashishias's communication

with the jury did not prejudice the petitioner. Id. at 87-89.

3.    *Attorney Schertz's First No-Merit Report (Dkt. No. 24-2)*

The petitioner filed a notice of appeal on June 25, 2014. See Carter, Case No. 11CF003689 (available at https://wcca.wicourts.gov). In October 2014, Attorney Schertz filed a no-merit report finding no appealable issues. Dkt. No. 24-2 at 3, 43. Attorney Schertz's report considered whether the petitioner's sentence was excessive, id. at 35, "whether [the petitioner] received a fair trial at which there was sufficient evidence for a finding of guilt," id. at 36, and whether the petitioner received the effective assistance of counsel, id. at 43.

Attorney Schertz found "nothing in the record to support a claim that the court's sentence was excessive under the circumstances." Id. at 36. He reasoned that "[the petitioner] [could not] show an unreasonable or unjustifiable basis for the sentence he received," id. at 35, "[t]he court stated the factors upon which it relied in passing sentence," id. at 36, "[t]here [was] no indication that it gave too much weight to any one factor," id. at 36, "[t]here [was] no evidence that the court relied on irrelevant or immaterial factors," id. at 36, and "the court was well within the possible sentence allowed by law," id. at 36.

Attorney Schertz concluded that the petitioner "received a fair trial at which there was sufficient evidence for a finding of guilt," reasoning that (1) "there was more than sufficient evidence for the jury to have reached the verdicts it did," id. at 36; (2) the court properly granted the State's other acts motion, id. at 37; (3) the court properly denied the petitioner's Shiffra motion, id.; (4) the court properly found that the petitioner's speedy trial waiver was

8

freely, voluntarily and intelligently given, id.; (5) the court properly denied the petitioner's request "to introduce evidence of a prior domestic violence case involving the victim," id. at 38; (6) the court properly denied the petitioner's request to introduce evidence of what he "claimed was a prior false allegation of sexual assault by the victim against a police officer," id. at 38; (7) the court properly denied the petitioner's requests for his attorney to withdraw the week the trial was supposed to begin, id. at 38-39; (8) the court properly excused a tardy juror on the fourth day of trial, id. at 39; (9) the court properly denied a hypothetical mistrial motion based on a Department of Corrections agent's testimony in which the agent erroneously referred to the petitioner as a sex offender, id. at 39-40; (10) the court properly denied the petitioner's request to elicit testimony regarding "the victim's reputation for untruthfulness," id. at 40; (11) Attorney Andriusis's performance did not violate the petitioner's right to a fair trial, id. at 40-41; (12) the court properly instructed the jury on other acts evidence, id. at 41; (13) the court correctly denied a motion for a mistrial alleging that the court showed "excessive compassion for the alleged victim," id. at 41; (14) the court correctly denied the petitioner's post-verdict motions, id. at 41-42; (15) the court properly excused a "juror with a doctor's appointment as the last alternate," id. at 42; (16) the court properly denied the petitioner's motion for a new trial based on Deputy Kashishias's communication with the jury, id. at 42-43; and (17) the petitioner did not receive ineffective assistance of counsel, id. at 43.

9

In December 2014, the petitioner filed a response to Attorney Schertz's no-merit report. Dkt. No. 24-5. The petitioner argued that the no-merit report violated "Wis. Stat. Rule 809.32" and the United States Supreme Court's decision in McCoy v. Court of Appeals of Wis. because Attorney Schertz relied on "unexplained assumptions and [conclusory] allegations" to explain why he found the various issues meritless. Id. at 2 (citing McCoy, 486 U.S. 429, 440, 442-44 (1988)). The petitioner asserted that "it [did] not appear that Attorney [] Schertz resolved all doubts and ambiguous legal questions" in the petitioner's favor. Id.

4.    *Supplemental No-Merit Report (Dkt. No. 24-4)*

On July 13, 2015, after it "independently reviewed the record, the no-merit report, and [the petitioner's] response as mandated by Anders [v. California, 386 U.S. 738 (1967)]," the Wisconsin Court of Appeals ordered Attorney Schertz to file a supplemental no-merit report. Dkt. No. 24-3 at 1-2. The court ordered further analysis of the other acts issue, directing Attorney Schertz "to cite 'the principle cases and statutes and the facts in the record that support the conclusion that the [issue] is meritless.'" Id. at 2 (quoting McCoy, 486 U.S. at 440). The court asked Attorney Schertz to "specifically address, with references to the record and authority:" (1) what other acts the trial court found admissible at trial; (2) whether the circuit court's lack of an on-the-record analysis of prejudice raised an "issue of arguable merit;" (3) whether the admission of the other acts evidence unduly prejudiced the petitioner; (4) whether all of the other acts introduced at the trial were

10

encompassed by the circuit court's other acts ruling; and (5) "whether trial counsel provided ineffective assistance by not objecting to the admission of certain other acts evidence during trial." Id. at 2.

The court also ordered Attorney Schertz to conduct additional analysis of the Department of Corrections agent's testimony. Id. "In addition to citing applicable case law and facts in the record," the court directed Attorney Schertz "to specifically address: (1) whether there would be potential merit to assert that trial counsel provided ineffective assistance by not objecting sooner and/or moving for a mistrial; and (2) whether there would be any arguable merit to challenge the trial court's analysis that it would not have granted a mistrial even if [the petitioner] had formally moved for it." Id. at 2-3.

Two and a half months later, Attorney Schertz filed his supplemental no-merit report. Dkt. No. 24-4. Focusing on the Wisconsin Supreme Court's 1998 decision in State v. Sullivan, 216 Wis. 2d 768, 772-73 (Wis. 1998),[4] Attorney Schertz discussed case law governing the admissibility of other acts evidence in Wisconsin. Id. at 2-10 (citing Sullivan, 216 Wis. at 772-73; State v. Kaster, 148 Wis. 2d 789, 797 (Wis. Ct. App. 1989); State v. Hunt, 263 Wis. 2d 1 (2003); State v. Bettinger, 100 Wis. 2d 691, 697 (1981); State v. Clemons, 164 Wis. 2d 506, 514-16 (Wis. Ct. App. 1991); Holmes v. State, 76 Wis. 2d 259, 273 (1977);

---

[4] A Wisconsin trial court considering an "other acts" motion applies a three-part analysis: "first, whether the proposed evidence falls within one of the exceptions of Wis. Stat. § 904.02(2); second, whether the evidence is relevant; and third, whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice to the defendant." Dkt. No. 24-4 at 2-3 (citing Sullivan, 216 Wis. 2d at 772-73).

Bailey v. State, 65 Wis. 2d 331, 347 (Wis. 1974); State v. Jensen, 331 Wis. 2d 440, 480 (Wis. Ct. App. 2011); State v. Jones, 151 Wis. 2d 488, 493 (Wis. Ct. App. 1989); State v. Davidson, 236 Wis. 2d 537, 575 (Wis. 2000)).

Attorney Schertz concluded that (1) a claim for a new trial based on the circuit court's decision to grant the other acts motion would have been meritless, id. at 5-6; (2) the trial court's other acts ruling "[i]n theory . . . included everything referenced in those [seventy-three] pages of exhibits attached to the State's motion," id. at 6; (3) the trial court did not unfairly prejudice the petitioner by failing conduct an on-the-record Sullivan analysis, id. at 6-7; (4) the trial court did not unduly prejudice the petitioner when it admitted the other acts evidence, id. at 7-8; (5) the court did not unfairly prejudice the petitioner by admitting other acts evidence not covered by the court's other acts ruling, id. at 8-10; (6) trial counsel was not ineffective for failing to object to the complaining witness's testimony, id. at 10; (7) "the only potential ground for a new trial motion based upon the DOC agent's unexpected (and unprompted) testimony would be a claim that defense counsel was ineffective for either not moving for a mistrial following this testimony," or for not accepting the court's offer for a curative instruction, id. at 12; and (8) a claim that defense counsel was ineffective either for failing to move for a mistrial based upon the Department of Corrections agent's testimony, or for failing to accept the court's offer for a curative instruction, would be meritless because the agent's answers to the prosecutor's questions following the sidebar

12

made it clear that the petitioner was not being supervised as a sex offender, id. at 13.

### 5. *Wisconsin Court of Appeals Decision (Dkt. No. 24-6)*

The Wisconsin Court of Appeals summarily affirmed the petitioner's conviction on November 5, 2015. Dkt. No. 24-6 at 2. Noting its independent review of the trial record, the no-merit and supplemental no-merit reports, and the petitioner's response "as mandated by Anders," the court found "no issue of arguable merit that could be pursued on appeal." Id. at 1-2 (citing Anders, 386 U.S. 738). The court explained that while it agreed with Attorney Schertz's "description and analysis, [it would] briefly discuss several of the identified issues." Id. The court referenced a footnote, which explained:

> This court will not attempt to address every issue that arose in this case. The thirty-nine page no-merit report and the twelve-page supplemental report provide an exhaustive summary of the numerous motions and rulings that occurred before and during trial. As noted, we agree with counsel's analysis and conclusion that none of the issues identified presents an issue of arguable merit.

Id. The court reviewed the trial court's decision to admit the State's other acts evidence, the trial court's decision not to declare a mistrial after a Department of Corrections agent referred to the petitioner as a sex offender, the performance of the petitioner's trial counsel and the alleged excessiveness of the sentence. Id. at 5-7. On each issue, the court agreed with Attorney Schertz and found no arguable merit to pursue an appeal or motion. See id. at 5, 6, 7-8.

Regarding the State's other acts motion, the Court of Appeals found that the trial court "engaged in the requisite analysis under [Sullivan]," and that

13

"[a]lthough the trial court did not explicitly discuss whether the probative value of the proffered evidence outweighed the risk of unfair prejudice, an appellate court 'independently review[s] the evidence to determine if it supports the trial court's decision to admit the other crimes evidence.'" Id. at 5 (citing Sullivan, 216 Wis. 2d at 772-73; State v. Shillcutt, 116 Wis. 2d 227, 236 (Wis. Ct. App. 1983)). The Court of Appeals concluded that after reviewing the record, there was "no arguable merit to assert that the trial court's decision was unsupported by the record." Id. It found that "the trial court . . . explicitly addressed all three prongs of the Sullivan test, and [] gave the appropriate cautionary instructions." Id.

The court next considered the testimony of the Department of Corrections agent:

> On direct examination, as the agent was explaining that [the petitioner] was on her caseload and that she is a sex offender specialist, the agent added that [the petitioner] "has a prior sexual assault, but he was actually on [supervision] for two counts of battery." Later, the agent referred to [the petitioner] and the other men she supervised as "sex offenders." Trial counsel sought a sidebar conference, after which the State clarified with the witness that the Department may put people under sex offender supervision "even if they were not in that instance convicted of a sex offense." The State further clarified that [the petitioner] was on supervision for batteries. Later, outside the jury's presence, trial counsel told the trial court that he thought the State had "cleaned up" the problem and that there was no need for a mistrial. The trial court recognized that trial counsel was not seeking a mistrial, but it nonetheless considered whether one should be granted and concluded that a mistrial was not warranted because the jury had already heard "a lot of evidence of sexual assault by [the petitioner] against [Smith], some charged and some as prior bad acts" and it was unlikely that the reference to sex offender supervision "would rise to the level of any kind of prejudice that would warrant a mistrial." Before the case was submitted to the jury, trial counsel told the trial court that he did not want to have a curative instruction.

14

Id. at 5-6. The court agreed with Attorney Schertz that "a motion or appeal based on the witness's statements, the trial court's handling of the issue, or trial counsel's decision not to seek a curative instruction concerning this issue" would have been meritless. Id. at 6.

As to trial counsel's performance, the Court of Appeals agreed with Attorney Schertz, finding nothing "that would rise to the level of ineffective assistance." Id. "Finally, [the court] turn[ed] to sentencing," and concluded that "there would be no arguable basis to assert that the trial court erroneously exercised its sentencing discretion, or that the sentences were excessive." Id. at 6-7 (citing State v. Gallion, 270 Wis. 2d 535, 549 (Wis. 2004); Ocanas v. State, 70 Wis. 2d 179, 185 (Wis. 1975)). "[T]he trial court," according to the Court of Appeals, "applied the standard sentencing factors and explained their application in accordance with the framework set forth in *Gallion* and its progeny." Id. at 7. It noted that the trial court "discussed the severity of the abuse Smith suffered," "discussed [the petitioner's] criminal history" and "concluded that in order to prevent [the petitioner][5] from victimizing Smith or others again, it needed to impose a sentence that would 'not allow [the petitioner] to see the light outside of a prison.'" Id. "[The court's] review of the sentencing transcript [led] it to conclude that there would be no merit to challenging the trial court's compliance with *Gallion*." Id.

---

[5] The Court of Appeals' decision actually names 'Smith,' not the petitioner. This court understands that to be an error, and that the court intended to refer to the petitioner.

15

The court similarly found that "there would be no merit to assert that the sentence was excessive" under Ocanas. Id. It reasoned that "[w]hile the sixty-three-year term of initial confinement is significant and is, in all likelihood, a life sentence, . . . [the petitioner] was convicted of six serious felonies" and "was facing over two hundred years of imprisonment." Id. at 7-8. The court found the sentence imposed "well within the maximum sentence and [] discern[ed] no erroneous exercise of discretion." Id. at 8 (citing State v. Scaccio, 240 Wis. 2d 95, 108 (Wis. Ct. App. 2000)).

   6. *Petition for Review in the Wisconsin Supreme Court*

The petitioner filed a petition for review in the Wisconsin Supreme Court on December 7, 2015. Dkt. No. 24-7; see also Carter, Case No. 14AP001459 (available at https://wscca.wicourts.gov). He argued that the Court of Appeals had violated his right to a meaningful appeal and his right to the effective assistance of appellate counsel when it accepted Attorney Schertz's no-merit report. Id. at 5.

The petitioner alleged that (1) the trial court had violated his due process rights when it denied his Shiffra motion; (2) the trial court had violated his right to present a defense when it denied his request to introduce evidence to impeach a witness; (3) the trial court had "violated [his] Sixth Amendment right to effective assistance of counsel when it failed to inquire into . . . [his] implicit request for new trial counsel;" (4) "[he] was denied his Sixth Amendment right to counsel and the right to be present when the bailiff had ex parte communications which prejudicially affected his right to a fair trial;" (5) the

trial court violated his right to present a defense when it denied a motion to introduce "false allegations of sexual contact;" (6) "trial counsel provided ineffective assistance of counsel;" and (7) the Court of Appeals erred when it determined that the trial court correctly had admitted other acts evidence. Id. at 5-6.

On May 5, 2016, the Wisconsin Supreme Court denied review. Dkt. No. 24-9.

B.    Federal *Habeas* Petition (Dkt. No. 1)

The petitioner filed his federal *habeas* petition on October 30, 2017, arguing that the Wisconsin Court of Appeals had violated his Sixth Amendment right to effective assistance of appellate counsel and his Fourteenth Amendment right to a meaningful appeal when it accepted Attorney Schertz's no-merit report. Dkt. No. 1 at 1, 6. On November 17, 2017, Magistrate Judge William Duffin screened the petition under Rule 4 of the Rules Governing Section 2254 Cases. Dkt. No. 9. Judge Duffin explained his understanding of the petitioner's claims:

> [The petitioner] alleges a violation of his sixth amendment right to effective assistance of counsel on his first appeal as of right and his fourteenth amendment right to a meaningful appeal when the Wisconsin Court of Appeals accepted an inadequate no merit report. [The petitioner's] claims were exhausted before the state court in Wis. Appeal No. 2014AP001459. The United States Supreme Court denied [the petitioner's] petition for a writ of certiorari on November 28, 2016. Therefore, the respondent shall answer the petition.

Id. at 2.

On January 4, 2018, the respondent filed a motion to dismiss the petition, dkt. no. 13, arguing that because the petitioner did not exhaust his

17

ineffective assistance claim, his petition was mixed, dkt. no. 14 at 1, 5. According to the respondent, Wisconsin law requires a defendant to raise an ineffective assistance of appellate counsel claim through a *habeas* petition in the Wisconsin Court of Appeals. Id. at 4 (citing State v. Knight, 168 Wis. 2d 509, 512-13 (Wis. 1992)). The respondent asserted that the petitioner had challenged his appellate attorney's performance through a *certiorari* petition to the Wisconsin Supreme Court rather through a *habeas* petition in the Wisconsin Court of Appeals. Id. at 5. Ultimately, the respondent said, the petitioner never fairly presented that claim to the Wisconsin courts. Id. (citing Knight, 168 Wis. 2d at 512-13).

The petitioner responded that his petition was not mixed; he contended that he fairly had presented his "claim that he was deprived of 'his sixth amendment right to the effective assistance of counsel on his first appeal as of right and his fourteenth amendment right to a meaningful appeal when the Wisconsin Court of Appeals accepted an inadequate no-merit report' to both the Wisconsin Court of Appeals . . . and the Wisconsin Supreme Court." Dkt. No. 15 at 4 (citation and emphasis omitted). He asserted that he had "provided the court of appeals with a 'fair opportunity' to address his challenge . . . to 'appellate counsel's [] no-merit report,'" and that he "then went on to exhaust his challenge first made in his response to appellate counsel's [] no-merit report/brief . . . to the Wisconsin Supreme Court." Id. at 5. The petitioner asserted that his petition had "alleged [no] independent claim of the ineffective assistance of appellate counsel," and that his petition for review in the

18

Wisconsin Supreme Court had challenged only "the Wisconsin Court of Appeals failure to properly follow the no-merit procedures required by *Anders v. California*, 386 U.S. 738 (1967), as codified in Wis. Stat. [§]809.32." Id. at 5-6. He stressed that "a claim alleging that [an appellate court's] failure to follow the no-merit procedures required by *Anders* . . . [and] Wis. Stat. [§]809.32 deprived a petitioner's right to the effective assistance of appellate counsel is legally distinct from an independent claim alleging the ineffective assistance of appellate counsel under a *Strickland* analysis." Id.

In reply, the respondent noted that the petitioner "improperly combines his claims in an attempt at skirting his exhaustion defect." Dkt. No. 17 at 1. "Although he attempts to recharacterize it in his response," the respondent argued, "[the petitioner's] primary basis for habeas relief is an unexhausted Sixth Amendment ineffective assistance claim." Id. at 2. "[T]he essence of [the petitioner's] federal habeas claim," the respondent concluded, "is the constitutionally inadequate analysis performed by his appellate counsel," "[a]nd that claim was never presented to the Wisconsin Court of Appeals as a constitutional claim." Id. at 3.

On June 11, 2018, this court referred the case to Judge Duffin for a report and recommendation. Dkt. No. 18. Judge Duffin clarified that when he initially had screened the petition, he had understood it as alleging both a denial of the petitioner's Fourteenth Amendment right to a meaningful appeal, and a denial of his Sixth Amendment right to the effective assistance of counsel. Dkt. No. 19 at 3. Judge Duffin concluded that the petitioner had not

19

exhausted his ineffective assistance of counsel claim because he never had presented it to the Wisconsin Court of Appeals. Id. at 3. Judge Duffin concluded that the petitioner had argued only that his appellate counsel's no-merit brief did not meet the requirements of Wis. Stat. §809.32. Id. at 3-5. Judge Duffin recommended that this court grant the motion to dismiss unless the petitioner moved to withdraw his ineffective assistance claim or asked the court to stay the federal *habeas* proceedings and hold his petition in abeyance while he returned to the Wisconsin Court of Appeals to properly exhaust the ineffective assistance claim. Id. at 7. In January of 2019, the petitioner filed a motion to withdraw his ineffective assistance of appellate counsel claim. Dkt. No. 21.

Noting that neither party had objected to Judge Duffin's report and recommendation, this court reviewed it for clear error, found none and adopted the report and recommendation on March 25, 2019. Dkt. No. 22 at 6. The court agreed that the petition asserted separate claims under the Fourteenth and Sixth Amendments, that the petitioner never had exhausted the Sixth Amendment claim and that this had resulted in a mixed petition. Id. at 6-7. The court also agreed with Judge Duffin's recommendation that the court give the petitioner the option to either dismiss the unexhausted claim or to ask the court to stay the case so that he could return to state court to exhaust the unexhausted claim. Id. at 7. The court allowed the petitioner to withdraw his unexhausted claim and denied the motion to dismiss. Id. The court ordered the petitioner, however, to "confine his future arguments to the question of

20

whether the state court denied him his Fourteenth Amendment right to a meaningful appeal by accepting and adopting the no-merit brief." Id.

About two months later, the respondent answered the petition under Rule 5 of the Rules Governing Section 2254 Cases; the respondent asserted "that the [Wisconsin Court of Appeals] did not deny [the petitioner] his Fourteenth Amendment right to a meaningful appeal by accepting and adopting the no-merit brief" and that "any constitutional violation was harmless error." Dkt. No. 24 at 3-4.

### C. Petitioner's Brief in Support (Dkt. No. 29)

In his brief in support of the petition, the petitioner asserts that the Wisconsin Court of Appeals violated Anders, 386 U.S. 738—and his Fourteenth Amendment right to a meaningful appeal—when it agreed with the conclusions in Attorney Schertz's no-merit reports that (1) there was no merit to a claim based on Deputy Kashishias's response to the jury's question, (2) there was no merit to a claim based on the trial court's denial of the petitioner's Shiffra motion and (3) the trial court was within its discretion in denying the petitioner's request for the withdrawal of his attorney. Dkt. No. 29 at 8, 16, 24. The petitioner contends that each of these issues had arguable merit. Id. at 9, 16, 26. He alleges that the Wisconsin Court of Appeals unreasonably applied Anders when it stated in a footnote that it "[would] not attempt to address every issue in the case;" he reasons that when it "simply agree[d] with counsel's analysis and conclusion," the Wisconsin Court of Appeals failed to "conduct a 'full examination of all the proceedings to decide whether the case [was] wholly

21

frivolous.'" Id. at 9 (citing Anders, 386 U.S. at 744-45). He asserts that under

Anders, the Wisconsin Court of Appeals "had an obligation to afford [the

petitioner] the assistance of counsel" to argue each of his claims. Id. at 16

(citing Anders, 386 U.S. at 744); see also id. at 26, 33.

The petitioner argues that the Milwaukee County Circuit Court erred

throughout his trial. He maintains that the court (1) violated Rushen v. Spain,

464 U.S. 114 (1983) when it failed to conduct a hearing to determine whether

Deputy Kashishias's communication with the jury was harmless, id. at 11; (2)

violated Remmer v. United States, 347 U.S. 227 (1954) when it failed to find

that communication presumptively prejudicial, id. at 11; (3) violated Owens v.

Duckworth, 727 F.2d 643 (7th Cir. 1984) when it declined to place the burden

on the government to establish that contact between Deputy Kashishias and

the jury was harmless, id. at 11-12; (4) violated Wisconsin law by failing to find

Deputy Kashishias's communication with the jury to be prejudicial as a matter

of law, id. at 13-14 (citing State v. Gibas, 199 Wis. 2d 525 (Wis. Ct. App.

1996)); (5) unreasonably applied Pennsylvania v. Ritchie, 480 U.S. 39 (1987)

when it denied the petitioner's Shiffra motion and found that it had "no basis

[and] . . . that it was a fishing expedition based upon non-specific, bald

assertions by the defense," id. at 23-24; (6) violated his Sixth Amendment right

to counsel of his own choice, id. at 31 (citing U.S. v. Gonzalez-Lopez, 548 U.S.

140, 144-46 (2006)); (7) failed to explore whether there was a complete

communicational breakdown between [the petitioner] and trial counsel," id. at

27-28 (citing State v. McDowell, 272 Wis. 2d 488 (Wis. 2004)); (8) failed to

22

"retrospective[ly] inquir[e]" into the petitioner's "implicit request for substitute counsel," id. at 31; (9) failed to develop a sufficient record as to why the petitioner fired his own attorney, id. at 29, 33 (citing State v. Lomax, 146 Wis. 2d 356 (Wis. 1988)); (10) unreasonably determined that the petitioner was "playing games" when he fired his attorney, id. at 29-30; and (11) "unreasonably determined that [the petitioner's] request for substitute counsel was merely a ploy for [the petitioner] to attempt to stall out the process of proceeding to trial." Id. at 30.

    D.    <u>Respondent's Brief in Opposition (Dkt. No. 30)</u>

Stressing that the petition "is limited to one claim—that the Wisconsin Court of Appeals' decision accepting the no-merit report violated his due process right to a meaningful appeal," the respondent argues that the court should deny relief because the Wisconsin Court of Appeals' decision was not contrary to federal law. Dkt. No. 30 at 8. According to the respondent, <u>Anders</u> creates no "independent constitutional command" and does not constitutionally prescribe a specific procedure for the Wisconsin Court of Appeals. Id. (citing <u>Smith v. Robbins</u>, 528 U.S. 259, 273 (2000)). The respondent argues that <u>Anders</u> pertains to an appellate attorney's conduct, not the conduct of the appellate court. Id. (citing <u>Robbins</u>, 528 U.S. at 273). In any event, the respondent says, "the Wisconsin Court of Appeals reviewed the entire record and submissions and independently concluded that [the petitioner] had no meritorious issues on which to base an appeal." Id. at 9.

The respondent asserts that the Wisconsin Court of Appeals did not unreasonably apply clearly established federal law when it adopted the no-merit report's conclusion that the petitioner's "jury tampering claim" would have been meritless. Id. at 9, 10. Beyond Anders, the respondent argues, "the only United States Supreme Court case law [the petitioner] cites in support of a mistrial is [Spain, 464 U.S. 114] and [Remmer, 347 U.S. 227]," and the respondent asserts that the Wisconsin Court of Appeals' decision violated neither case. Id. at 11. According to the respondent, Spain clarifies that (1) *ex parte* communications between a judge and a juror can be harmless, id.; (2) "the Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote,'" id. (citing Spain, 464 U.S. at 119); (3) "[w]hen an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties," id. (citing Spain, 464 U.S. at 119); and (4) "it is only where the court fails to disclose the contact that a post-trial hearing is used to determine prejudice," id. (citing Spain, 464 U.S. at 119). The respondent stresses that in the petitioner's case, "the trial judge told the parties about [Deputy Kashishias's] contact with the jury" and "explained that the contact was made harmless by the fact that [Deputy Kashishias] answered the juror's question just as the court would have." Id. at 12.

24

The respondent agrees that Remmer directs a presumption of prejudice
on a finding of certain communications "with a juror during a trial about the
matter pending before the jury." Id. (citing Remmer, 347 U.S. at 229). The
respondent stresses, however, that the presumption "is overcome upon a
showing that the juror contact was harmless." Id. (citing Remmer, 347 U.S. at
229). The respondent asserts that in the petitioner's case, the trial court
"disclosed to both parties that [Deputy Kashishias] answered the jury's
question," "explained that the deputy's answer was the same thing the court
would have said, and found that the jury contact was harmless." Id. The
respondent says that "under no-merit review," the Wisconsin Court of Appeals
independently reviewed all potential issues and adopted the finding that the
jury tampering claim was meritless. Id.

The respondent notes that although the Wisconsin Court of Appeals "did
not expressly discuss" the Shiffra issue, it (1) "identified it as one of the
numerous issues [the petitioner] raised," and (2) "reviewed the record and all
submissions," including "[t]he no-merit report thoroughly discuss[ing] the
issue," and (3) independently concluded that all of those issues were meritless.
Id. at 14. The respondent argues that the Wisconsin Court of Appeals' decision
did not violate Ritchie, contending that (1) rather than requiring the petitioner
to make a particularized showing, the trial court reasonably rejected the
petitioner's motion "because he did not make a plausible showing of how the
records were both 'material and favorable to his defense,'" and (2) the
Wisconsin Court of Appeals "did not expressly apply Ritchie because it agreed

25

with the no-merit report" that the issue was meritless. Id. at 15-16 (citing Moseley v. Kemper, 860 F.3d 1020, 1023-24).

Regarding the petitioner's claim "that the trial court violated his Sixth Amendment right to counsel of choice by not allowing him to fire his attorney a week before trial," the respondent argues that the petitioner "neglects to show how the state court's decision conflicts with federal law." Id. at 17. The respondent notes that "[n]either [the petitioner], nor his trial attorney, ever made a formal request for new trial counsel." Id. Asserting that "trial counsel never provided the court with a legitimate reason for withdrawal," the respondent concludes that "the trial court was well within its discretion to deny such a request." Id. The respondent says that the petitioner "was not constitutionally entitled to counsel of choice." Id. at 18 (citing United States v. Gonzalez-Lopez, 548 U.S. 140, 151 (2006); United States v. Bender, 539 F.3d 449, 454-55 (7th Cir. 2008)). The respondent clarifies that "to the extent that [the petitioner] alleges that communication with his attorney broke down as a result of neglect or ineptitude by counsel, [the petitioner] would have had to present, support, and exhaust a claim of ineffective assistance of counsel." Id. (citing United States v. Wallace, 753 F.3d 671, 675 (7th Cir. 2014).

   E.   Petitioner's Reply Brief (Dkt. No. 33)

The petitioner insists that Anders requires an appellate court to "fully examine all of the proceedings, to decide whether the case is wholly frivolous." Dkt. No. 33 at 2 (citing Anders, 386 U.S. at 744-45). Relying on Douglas v. People of State of Cal., 372 U.S. 353, 354 (1963), the petitioner asserts that his

appeal was merely "a meaningless ritual" and that the Wisconsin Court of

Appeals denied his right to appellate counsel. Id. at 3-4. He states that

> [c]ontrary to the respondent's argument, [the petitioner] is not
> reframing the claim, he is alleging that the [Wisconsin Court of
> Appeals'] determination that his appeal is wholly frivolous is
> unreasonable under *Anders*, which violates his right to a meaningful
> appeal. That there exists arguable meritorious claims that [the
> petitioner] discusses to prove that the [Wisconsin Court of Appeals]
> violated *Anders* and in turn violated his fourteenth amendment right
> to a meaningful appeal shows [their] interrelatedness to each other,
> not a reframing.

Id. at 4. Finally, the petitioner asserts that the trial court violated his

constitutional right to *substitute* his appointed counsel, not his right to counsel

of choice. Id. at 11-15.

**II.     Analysis**

A.     <u>Standard</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996  a

federal court may grant *habeas* relief only if the state court decision was "either

(1) 'contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States,' or (2)

'based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.'" <u>Miller v. Smith</u>, 765 F.3d 754, 759-

60 (7th Cir. 2014) (quoting 28 U.S.C. §2254(d)(1), (2)). A federal *habeas* court

reviews the decision of the last state court to rule on the merits of the

petitioner's claim. <u>Charlton v. Davis</u>, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that

court concludes in its independent judgment that the relevant state-court

27

decision applied clearly established federal law erroneously or incorrectly.'"
Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Williams v. Taylor, 529 U.S.
362, 410 (2000)). "The 'unreasonable application' clause requires the state
court decision to be *more* than incorrect or erroneous. The state court's
application of clearly established law must be objectively unreasonable."
Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words,
§2254(d)(1) allows a court to grant *habeas* relief only where it determines that
the state court applied federal law in an "objectively unreasonable" way.
Renico, 559 U.S. at 773. "The standard under §2254(d) is 'difficult to meet' and
'highly deferential.'" Saxon v. Lashbrook, 873 F.3d 982, 987 (7th Cir. 2017)
(quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011)).

    B.    <u>Analysis</u>

    Under the Sixth Amendment, a criminal defendant has a right to
appellate counsel on direct appeal. Douglas, 372 U.S. at 357. On appeal,
however, a criminal defendant no longer enjoys the presumption of innocence.
McCoy, 486 U.S. at 436. "An indigent defendant's counsel on appeal 'cannot
serve the client's interest without asserting specific grounds for reversal.'" Id. at
436. "For this reason, counsel is ethically prohibited from prosecuting a
frivolous appeal." Id.

    In Anders, the United States Supreme Court described an acceptable
procedure for reconciling an attorney's ethical obligation not to pursue a
frivolous appeal and a defendant's right to appellate counsel. Anders, 386 U.S.
at 744. In the first sentence of its decision, the Anders court noted its focus on

the actions of appellate counsel. Id. at 739 ("We are here concerned with the extent of the duty of a court-appointed appellate counsel to prosecute a first appeal from a criminal conviction, after that attorney has conscientiously determined that there is no merit to the indigent's appeal"). The Court explained that "if counsel finds [the] case . . . wholly frivolous, after a conscientious examination of it, [the attorney] should so advise the court and request permission to withdraw." Id. at 744. Such a request must be "accompanied by a brief referring to anything in the record that might arguably support the appeal." Id. The court then must provide the defendant with the attorney's no-merit brief and time to respond to it. Id. The court then fully examines the proceedings and decides whether the case is "wholly frivolous." Id.

But the acceptable procedure the Court described in Anders is not the only possible procedure a state court might use, and is not mandatory. Smith v. Robbins, 528 U.S. 259, 265 (2000). "[T]he Constitution itself does not compel the Anders procedure." Id. at 273. "[T]he Anders procedure is not 'an independent constitutional command,' but rather is just 'a prophylactic framework' that [the United States Supreme Court] established to vindicate the constitutional right to appellate counsel announced in Douglas." Id. (quoting Pennsylvania v. Finley, 481 U.S. 551, 555 (1987)). "[The Court] did not say that [the] Anders procedure was the only prophylactic framework that could adequately vindicate this right; instead, by making clear that the Constitution itself does not compel the Anders procedure, [the Court] suggested otherwise."

29

Id. The court stated that <u>Anders</u> merely outlined "an *acceptable* procedure," and "the States are free to adopt different procedures so long as those procedures adequately safeguard a defendant's right to appellate counsel." <u>Id.</u> at 265 (emphasis added).

The court first notes that in its March 25, 2019 order, this court "agree[d] with Judge Duffin that the petitioner presented both a Fourteenth Amendment claim and a Sixth Amendment claim, that he had not exhausted the Sixth Amendment claim and that this resulted in a 'mixed' petition." Dkt. No. 22 at 6-7. The court "allow[ed] the petitioner to withdraw his unexhausted Sixth Amendment ineffective assistance of appellate counsel claim," and cautioned the petitioner to "confine his future arguments to the question of whether the state court denied him his Fourteenth Amendment right to a meaningful appeal by accepting and adopting the no-merit brief." <u>Id.</u> at 7. The petitioner cannot now circumvent that order by raising ineffective assistance of counsel claims—that the trial court did not explore whether there was a breakdown of communication with his counsel, that the trial court erred in failing to allow him to substitute counsel, etc.—under the guise of claiming that the Wisconsin courts denied his right to a meaningful appeal under the Fourteenth Amendment when it adopted Attorney Schertz's no-merit reports. The court will not address those arguments because the petitioner did not exhaust his Sixth Amendment claim.

As for the petitioner's Fourteenth Amendment claim, <u>Anders</u> does not create a Fourteenth Amendment right for the state court to use a particular

30

process in reviewing a defendant's case to determine whether an appeal would be frivolous. It requires only that appellate counsel do more than simply advise the appeals court that the petitioner has no meritorious claims, by referencing anything in the record that could support an appeal. The petitioner has not argued that *Attorney Schertz* violated <u>Anders</u>, and there would be no support for such an argument in the record. Schertz referenced numerous issues that could conceivably have supported an appeal, and discussed some of those issues in more depth when asked by the court to do so. He did not simply report to the court that the petitioner had no meritorious issues and ask to withdraw.

As for the appellate court's obligation once it received the no-merit reports, the appellate court is required to determine whether an appeal would be frivolous. In a footnote of its decision adopting Attorney Schertz's no-merit reports and affirming the petitioner's convictions, the Wisconsin Court of Appeals stated:

> This court will not attempt to address every issue that arose in this case. The thirty-nine page no-merit report and the twelve-page supplemental report provide an exhaustive summary of the numerous motions and rulings that occurred before and during trial. As noted, we agree with counsel's analysis and conclusion that none of the issues identified presents an issue of arguable merit.

Dkt. No. 24-6 at 4. Based on this footnote, the petitioner concludes that the Wisconsin Court of Appeals failed to conduct "a full examination of all the proceedings, to decide whether the case is 'wholly frivolous'" as the United States Supreme Court used that phrase in <u>Anders</u>. Dkt. No. 29 at 9. This

31

argument assumes first that the acceptable procedure described in <u>Anders</u> is mandated by the Constitution; as the court has explained, it is not.

Even if it were, <u>Anders</u> does not hold that a "full examination of the proceedings" requires the appellate court to address every potential issue raised by appellate counsel, or that it conduct its own independent review of every possible appellate issue. The Wisconsin Court of Appeals did not, as the petitioner implies, simply rubber-stamp Attorney Schertz's conclusions. After reviewing the original no-merit report, it asked Attorney Schertz to more specifically address particular issues—despite the fact that the original report was extensive, detailed and *thirty-nine pages* in length. Schertz's supplemental report was another eleven pages. After reading both reports and explicitly stating that it had "independently reviewed the record"—arguably the "full examination of the proceedings" mentioned in <u>Anders</u>—the court concluded that there was no issue of arguable merit to pursue on appeal.

It is possible that the petitioner means to argue that the Court of Appeals did not follow Wisconsin's no-merit procedure; in opposing the no-merit brief, he referenced Wis. Stat. §809.32, which prescribes Wisconsin's no-merit procedure. If the Court of Appeals *did* violate Wis. Stat. §809.32,[6] that would not be a sufficient basis for this federal court to grant *habeas* relief. A federal

---

[6] Wis. Stat. §809.32(3) states, "In the event that the court of appeals determines that further appellate proceedings would be frivolous and without any arguable merit, the court of appeals shall affirm the judgment of conviction or final adjudication and the denial of any postconviction or postdisposition motion and relieve the attorney of further responsibility in the case." It does not require the appellate court to independently address every possible appellate issue or even to mention each issued raised in the no-merit brief.

32

court may grant *habeas* relief only when it finds that the state-court decision was contrary to, or involved an unreasonable application of, *federal* law as determined by the U.S. Supreme Court—not for violations of or unreasonable applications of state law. See, *e.g.*, Crawford v. Littlejohn, 963 F.3d 681, 683 (2020) ("errors of state law do not support collateral relief in federal court") (citing Estelle v. McGuire, 502 U.S. 62 (1991)).

The court will deny relief.

### III.  **Certificate of Appealability**

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability, because reasonable jurists could not debate that the petition does not warrant *habeas* relief under 28 U.S.C. §2254(d).

### IV.  **Conclusion**

The court **DISMISSES** the petition for writ of *habeas corpus*. Dkt. No. 1.

The court **ORDERS** the case is **DISMISSED**. The clerk will issue judgment accordingly.

Case 2:17-cv-01497-PP   Filed 01/09/23   Page 33 of 34   Document 38

The court **DECLINES** to issue a certificate of appealability.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Fed. R. Civ. P. 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ P. 6(b)(2). Any motion under Fed. R. Civ. P. 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 9th day of January, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**